**HALLIBURTON OIL WELL CEMENTING COMPANY, Appellant,**

v.

**Mrs. Truman Odell GROVES et al., Appellees.**

**No. 3493.**

Court of Civil Appeals of Texas.

Waco.

Dec. 19, 1957.

Rehearing Denied Jan. 16, 1958.

Fulbright, Crooker, Freeman, Bates & Jaworski, Sam W. Cruse, Charles M. Haden, Houston, for appellant.

Helm, Jones, McDermott & Pletcher, R. O. Kenley, Raymond L. McDermott, Shirley M. Helm, Albert P. Jones, Mabel G. Howell, Houston, for appellees.

TIREY, Justice.

This is a negligence case. Marvin Groves died from injuries received when a crown block broke on a workover rig in an oilfield on March 10, 1955. Suit was brought by appellees, Mrs. Truman Odell Groves, widow, and Barbara Groves Nugent, daughter, joined by her husband, Billy Ray Nugent, for damages sustained resulting from the injuries and death of Marvin Groves against appellant, Halliburton Oil Well Cementing Company. Appellees contend that specific acts of negligence on the part of appellant proximately caused the injuries and death of Marvin Groves. Traders & General Insurance Company, intervenor and workmen's compensation insurer for Marvin Groves' employer, did not participate in the trial because its rights were stipulated. At the close of appellees' case and at the close of all the evidence, appellant's motion for instructed verdict was overruled. The case went to the jury and after the jury verdict was received, appellant moved for judgment non obstante veredicto and for judgment on the verdict. Appellant's motions were overruled and the trial court entered judgment for appellees and intervenor against appellant in the total amount of $59,390. Appellant has perfected its appeal to this court.

Appellees went to trial on their original petition. We quote paragraphs 2 and 3, which constitute their allegations of negligence:

"II. At all times material to this cause of action, the defendant, Halliburton Oil Well Cementing Company was engaged in the business of rendering specialized oil field services in connection with the drilling of oil wells and the production of oil. It leases to the owners of oil wells certain tools, the exact nature of which is unknown to your plaintiffs but well known to the defendant. Your plaintiffs, Mrs. Truman Odell Groves and Barbara Groves Nugent, are the surviving widow and child of Marvin D. Groves, deceased. Your plaintiffs would respectfully show unto the court and jury that on March 10, 1955, Marvin D. Groves was an employee of Mobile Well Service. The discharge of the duties of his employment on said date required him to be on the premises at a well known as Pool No. 1, owned by H. L. Hunt Oil Company in the Long Lake Field in Anderson County, Texas. The deceased was a member of a crew of employees of Mobile Well Service who were working on the well known as Pool No. 1. The particular job of this crew was to do the rigging in connection with a sand-frac job thereon. Mobile Well Service furnished a derrick machine,

a crown block and the necessary small tools required to do its part of the job. Halliburton Oil Well Cementing Company was likewise employed by H. L. Hunt Oil Company in connection with this sand-frac job and had a crew of men on the premises on March 10, 1955. The tubing in the well was pulled out by the crew of Mobile Well Service. After the tubing had been pulled out, a tool of Halliburton Oil Well Cementing Company was attached near the lower end of the tubing, which was then put back in the well inside the casing to a depth of approximately 5,200 feet. It was ascertained during the morning of March 10, 1955, that the tool of the defendant was not working properly. About the hour of noon on March 10, 1955, the deceased, Marvin D. Groves, was directed to use the derrick machine for the purpose of withdrawing the tubing from the hole so that the tool of the defendant could be repaired and made to function properly. The pressure was applied by means of cables which ran through sheaves in the crown block. The application of pressure developed by the derrick machine, which was being operated by the deceased, did not raise the tool of the defendant. After the pressure had been applied several times, the deceased cut off the motor. He was then directed by the employee of the defendant to apply additional pressure in the effort to raise the tool. As this additional pressure was being applied under the directions of the employee of the defendant, the crown block suddenly spread. This caused the sheaves and the cable to fall. As the deceased was attempting to get out of danger, he was struck a glancing blow in the back by one of the sheaves, which bounced upward and struck him again causing him to be thrown from the catwalk down onto a large concrete pillar located at the base of one of the derrick legs. The incident made the basis of this suit was brought about by the negligence and carelessness of the employees of the defendant. As a result thereof, Marvin D. Groves received fatal injuries, which produced his death a short while later in the afternoon of March 10, 1955.

"III. The occurrence made the basis of this suit resulted from the negligence of the employees and representatives of the defendant, while acting in the course and scope of their employment, in some one or more of the following particulars:

"1, In furnishing a defective tool.

"2. In furnishing a tool which would not operate properly and thereby became stuck in the casing of the well.

"3. In directing the use of excessive pressure on the tubing.

"4. In failing to make proper inspection of the tool.

"5. In failing to discover the defective condition of the tool.

"6. In requiring the use of more pressure on the tubing than was reasonable and prudent.

"Each and all of the above and foregoing acts, both of omission and commission, were negligent and constituted negligence and were each and all a proximate cause of the occurrence made the basis of this suit and of the fatal injuries suffered by Marvin D. Groves and the damages suffered by your plaintiffs."

Appellant went to trial on its first amended original answer and we quote paragraphs 3 and 4 of such answer, which contain its defense to the allegations of negligence, save and except its general denial:

"3. On or about March 10, 1955, defendant was engaged by the Hunt Oil Company to do a sand-frac job on an

oil well owned by Hunt Oil Company, which sand-frac job substantially required the defendant to furnish a tool to. be placed in the hole for the purpose of pumping into the formation a substance to enable a better flow of oil. Mobile Well Service Company was engaged by Hunt Oil Company to furnish the equipment and to perform the work necessary to place the tool in the hole. Marvin D. Groves was an employee of Mobile Well Service Company and was in charge of the crew of Mobile that was doing the work at the well. The equipment furnished by Mobile under the direction of Marvin D. Groves was a pulling unit on the back of a truck, a crown block and other necessary tools to put the tool in the hole and to remove it. All of said equipment was in the exclusive possession and control of Mobile Well Service Company under the direction of Marvin D. Groves and this defendant had no duty to furnish such equipment as the pulling unit and crown block. On the day prior to the accident resulting in the death of Marvin D. Groves, Marvin D. Groves and his crew for Mobile Well Service Company rigged up their equipment at the well for the pulling of the rods and tubing so that the defendant's tool could be placed in the hole and such rigging was done under the direction of Marvin D. Groves. The employees of Mobile Well Service Company placed at the top of the derrick the crown block owned by Mobile Well Service Company. In placing the crown block in the top of the derrick and in rigging up their equipment the truck of Mobile Well Service, on which was placed the pulling unit, was placed at right angle to the crown block so that the line from the pulling unit to the sheaves in the crown block did not run in a straight line. Marvin D. Groves and the Mobile Well Service crew did not bring to the well a weight indicator or did not use a weight indicator to show what weight was being lifted or how much strain was being exerted at any given time when the pulling unit was in operation. The operation of the pulling unit was under the exclusive direction and control of Mobile Well Service and Marvin D. Groves. This defendant had no knowledge of the condition of any of the equipment that Mobile Well Service used at the well, including the condition of the crown block and the pulling unit.

"On March 10, 1955, Mobile Well Service crew, under the direction of Marvin D. Groves, had lowered into the hole this defendant's tool. Immediately prior to the accident defendant's employee signaled to Marvin D. Groves to pull up on the tubing and while Marvin D. Groves was operating the Mobile Well Service pulling unit the Mobile Well Service crown block parted causing the sheaves to fall, resulting in the injuries and death of Marvin D. Groves.

"The injuries and death of Marvin D. Groves proximately resulted from his negligence in one or more of the following particulars, to-wit:

"(1) In using a defective crown block.

"(2) In failing to use a weight indicator.

"(3) In rigging so that an undue strain was placed on the crown block.

"(4) In failing to know the condition and operational capacity of Mobile's equipment.

"(5) In continuing to operate the pulling unit to pull up on the tubing at a time when Mobile's equipment would not stand the strain.

"(6) In failing to warn anyone that Mobile's equipment would not stand the strain.

"Each and all of the above and foregoing acts of omission and commission were negligence and were each and all a proximate cause of the injuries and death of Marvin D. Groves.

"4. Defendant would further show that the pulling unit, the crown block and the other equipment used in pulling up on the tubing and defendant's tool were furnished by Mobile Well Service and under the di-

rection and control of Marvin D. Groves. Marvin D. Groves knew or should have known of the stress and strain the Mobile Well Service equipment would stand from its condition, the manner in which it was rigged up and the use to which it was being put at the time of the accident. Marvin D. Groves was not only in charge of the Mobile Well Service crew but he was operating the pulling unit himself at the time of the accident. When defendant's employee signaled to Marvin D. Groves to continue to operate the pulling unit so as to pull up on the tubing, Marvin D. Groves was in the best position of anyone to know whether or not any undue stress or strain was being placed on the Mobile Well Service equipment. If undue stress and strain was placed upon said equipment it was done by Marvin D. Groves' operation of the pulling unit and Marvin D. Groves thereby voluntarily exposed himself to the risk involved and a danger known to him or that should have been known to him."

Carnes, who was working as a roustabout for Mobile Well Service at the time Groves was killed, was called as a witness. He testified to the effect that the crew of which he was a member went to the well site on March 9, 1955, and that the accident occurred on the following day; that the well had a 2½ inch tubing inside a 5½ inch casing; that on March 9, 1955, after rigging up, the Mobile Well Service crew pulled the tubing; that a week before this crew had pulled the tubing on this well and had replaced some pieces with no difficulty; that the Mobile Well Service equipment was in good condition; that the Mobile truck was backed into the only position it could get in and that it was not unusual for the cable to be at a slight angle with the pulleys; that the manner in which the rigging was done did not place any more strain on the crown block than any other method; that appellant was called in to do the sand-frac job, and the Halliburton man brought out the tool on March 9th; that a Mr. Stark, the Halliburton man, was in complete charge of the tool; that the tool was very rusty and Mr. Stark beat on it with a sledge hammer before they started into the hole; that also he sanded some little things on the tool that were supposed to work free and put some oil on it and then hammered some more with the sledge hammer and told the Mobile crew to lower it in the hole. When the witness was asked what the occasion was for Stark's beating and sanding and oiling the tool, he replied that it was binding or something, and further stated that the whole thing looked like it was binding; that the Halliburton tool appeared to be "in pretty sad shape." A Mr. Thompson, the gang pusher for Hunt Oil Company, told Stark that he thought he kept his tools in better condition than they were in and Stark made no reply; that Stark worked on the tool with a sledge hammer and the oil and sandpaper for about thirty minutes; that after this had been done the Halliburton tool was put on the end of the tubing and they started back in the hole; that Stark tested the tool at about 300 feet and said that it was working all right; that he left and Mobile went on down to 2,200 feet that afternoon; that the Mobile crew came back the next morning and ran the tubing all the way to the bottom; that when they got to the bottom Stark set the bottom slips on the sand-frac tool; that after the tool was set at the bottom of the well the Halliburton crew started pumping and found the tool was leaking; that just before lunch they found the sand-frac tool was leaking and they wanted Groves to unset it; that the Mobile crew had started to lunch and Groves was called back; that while he was operating the pulling unit Groves was about ten feet from the hole; that Stark wanted Groves to unset the tool so he could reset it; that Groves made a quarter turn on the pipe; that Stark then signalled Groves "to pick up" on the tubing and Groves pulled on the tubing and then he locked the brake; that Stark kept motioning with his hand "to come on up" and Groves locked down again; that Stark said to come on out and he did that three times and then the sheaves fell and hit

Groves; that the fourth time Groves started operating his pulling unit Stark was motioning to come on up with it; that on the fourth time the sheaves came out of the crown block; that the pulley or sheave which struck Groves fell about 120 feet; that in operating the levers Groves would not have any feel of any pressure involved; that Stark would be in a better position, with his hand on the tubing, to tell how much strain was being applied to the tool in the bottom of the well; that Stark was in position to tell whether the tool was stuck on the bottom, and knowing what he did he kept on signalling for more pressure. The witness Carnes stated that there was nothing wrong with the derrick; that in this type of operation the rods go inside the tubing and the tubing is inside the casing; that the crown block was in good shape and it had been checked that morning, meaning March 10, 1955; that the sheaves are wheels with grooves or pulleys; that the crown block is two beams with two sheaves between them; that it would be incorrect to say that the crown block should be the strongest part of the works, as the cable or elevator should be the strongest; that the Mobile Well Service crew put the truck in the only place where it could be driven in to the derrick; that it was in the same place as it was the week before when the tubing had been pulled; that it would not make any difference how the crown block was set because there was 120 feet length in the line, which would not have put any bind on the sheaves; that his crew could not come in on the west side because there were some posts set in concrete, which could only be moved by a bulldozer; that the Mobile Well Service crew had pulled the well the week before without a weight indicator and they never used one unless the customer called for it; that the same crown block and pulling unit had been used on a number of occasions before; that while there was a heavier crown block there the Mobile crew would never use someone else's equipment because they did not know anything about it.

Frank C. Stark, a tester and tool operator for appellant, testified both by deposition and in person. Portions of his deposition were read into the evidence by counsel for appellee. From his testimony it appears that the Halliburton Tool was known as an HM tool; that this was a special patented tool, owned and operated by Halliburton; that these tools are not sold and it is necessary to call in Halliburton to operate the appliance for the customer; no one else on the job had any knowledge of the use of Halliburton's tools; that Groves had nothing to do with the management of the tool or that procedure. In response to the question, "Did the tool do the job it was supposed to do," the witness replied, "We didn't complete the job, no." After the tool was set the existence of a pressure leak somewhere was discovered; that the Halliburton tool was still in the bottom of the well; that they tried a little bit to get it out the next day, which would have been March 11, 1955. In describing the attempt to unseat the tool it was stated that Groves started to pick up on the tubing; that he picked "up a ways" and then slacked off and when he started to pick up again the sheaves came out of the crown block. "In the normal procedure, when you came on up, the tubing would have come up to where it should have and the packer would have unseated." There was nothing wrong with the derrick as far as Stark knew, and the derrick was sufficient to pull the weight of the tubing and stand 10,000 or 12,000 pounds more. It was Stark's idea that Groves did not pull hard enough to get the tool out of the well. When he was asked whether the tool was stuck down in there at the time the effort was made to unseat the packer, Stark replied that there was not enough of a pull on it to find out at the time whether it was or not in his estimation. It was his idea that the crown block was too weak. He would not have said anything if he had seen a crown block that didn't look strong enough; that lots of times he had put these tools in wells and had told them to give it the works without knowing that things were

safe. In describing the work that he did on the tool at the well site, he said that the bottom slips or pressure slips were upside down, that he took them out, turned them around and put them back in; that in spite of the fact that sufficient pull was exerted to wreck the crown block, Stark was of the opinion that the reason the tool did not unseat was that not enough pressure was applied; that the tool would not have worked without changing the slips and he would have had a failure; that on the following day when they tried to get the tool out of the well a pressure of 100,000 pounds was applied.

Mr. Stark, while he was on the stand, admitted that he had to do a little repair work on the tool; that he found the top slips upside down and turned them around; that it took about thirty minutes for the repair work; that when he picked up the tool it was stuck; it was upside down and stuck in the mandrel and so he took a hammer and knocked it loose; that after the tool had been set a leak was found; that when Groves started to pick up on the tubing, Stark had his right hand on the tubing; that the crown block was straight over the top of him; that he motioned for Groves to come up and he did come up a little ways and then stopped; that when he stopped the tubing collars were then a little better than waist high; that Stark then motioned to come on up; that when Groves got the tubing collars close to chin high, something broke and things started falling and Stark ran. Stark admitted that the crown block did not give way on March 9, 1955, when the tubing was pulled, and that the only thing different on March 10th was that they were pulling the tubing and the Halliburton tool. Stark declined to say whether the tool was stuck or not and admitted that it was possible for anything automatic to get out of shape; that if the slips jammed into the casing under pressure it would have to be jarred loose; that if they were tight it would take a lot of pressure to jar it loose; that the pressure used in trying to break a formation would

be from 500 to 5,000 pounds per square inch and that is a lot of pressure; that he did not need a weight indicator to tell the amount of weight or how much weight to put on the tubing to seal the rubbers against the casing; that while he did not remember using sandpaper to get the rust off he admitted that he might have used a file; that the Halliburton tool should not be permitted to get in such shape that you have to use oil and sandpaper on it; that he did put oil on the tool and used a file and a small hammer; that if the tool is working properly it should not jam in the well; that if the tool is working properly it should not require more than 12,000 pounds additional pull above the weight of the casing to get it out of the well; that a pressure of 47,-140 pounds should have been sufficient to pull up the tubing and the tool; that he made no test on the hydraulic slips to see if they would return on withdrawal of pressure; that when the tool was set on the way down at 300 feet he tested only the bottom slips; that all that Groves had available to him was a brake and a throttle; that Stark had his hand on the tubing and could feel all of the pressure being exerted; that the tool could not be gotten out of the well on the following day with 100,000 pounds of pressure but that was a different situation; that the tubing dropped about 3½ feet when the sheaves fell.

Billy Ray Nugent, the son-in-law of the deceased, testified to the effect that he was a member of the Mobile Well Service crew and was on the location at the time of the occurrence on March 10, 1955, when Groves was killed; that the same crown block and the same equipment was used a week before when the crew pulled the tubing in this well and replaced some pieces; that no trouble had been encountered the week before in pulling 35,000 pounds of tubing out of the hole; that the north side of the derrick was the only place where the truck could be backed in; that it was necessary to get the back of the truck under the derrick and the only way to set the crown block was in an east-west position; that

there was nothing unusual in the way the "rigging up" was done; that there was no undue strain on the crown block because in 100 feet the lines would be almost straight; that the line never did jump off the pulleys; that Mobile would bring the equipment ordered by the customer; that was whatever the customer wanted to pay for; that Mobile's charges were based on the equipment ordered and no weight indicator was requested; that a weight indicator had not been used the week before when the tubing was pulled; that it was not customary to take a weight indicator unless requested to do so; that neither Stark nor Halliburton ever asked for a weight indicator; that on March 9, 1955, all 35,000 pounds of tubing were pulled without any difficulty and the witness did not observe any strain on the crown block; that the crown block was rated at close to 100,000 pounds; that this crown block had been used in lifting weights up to 100,000 pounds on prior occasions with no trouble; that there was no reason why it could not stand a pull of 47,147 pounds because it had pulled a lot more weight before. This crown block had been used on wells 10,000 feet deep in which there would be 70,000 pounds of tubing; that the crown block was in perfect condition on March 9, 1955; that brand new cables were in use; that nothing out of the ordinary occurred on March 9, 1955, when the tubing was pulled; that he would not use someone else's crown block that he had not seen or operated before; that Stark sanded and oiled the Halliburton tool and beat on it with a sledge hammer on March 9, 1955; that he, Nugent, had washed up for lunch when Groves was called back and told that it would be necessary to do some more pulling; that Groves cranked up the machine and got the necessary pressure to run the machine; that Stark motioned for Groves to pick up the tubing and Groves applied pressure to the machine; that Groves would not feel any mechanical pressure on the levers when he was working them; that when the first signal was given Groves pulled a short distance, set his brake and shut the machine down; that Stark kept motioning for Groves to pull up farther and Groves released the brake and continued to pull; that Stark signalled a third time and Groves picked up a little further and shut his machine off and set the brake down again; that Stark looked impatient and motioned faster and said "come on up with it;" that when Groves applied pressure the fourth time the crown block parted and the sheaves fell; that in this operation Groves pulled out three or four feet of slack in the tubing; that there would ordinarily be about 3½ feet of slack in 5,000 feet of tubing; that the slack is zigzagged because the tubing is smaller than the casing; that after the slack was taken out and pressure applied, the tubing did not budge even an inch; that he had seen the same pulling unit pull that much pipe out of the hole twice without the Halliburton tool being attached to it; that the only difference on the third attempt at pulling the tubing was that the Halliburton tool was attached; that there had been no trouble until the Halliburton tool was attached to the tubing; that he did not know of anything that could keep the tubing from coming out unless it was the Halliburton tool; that after the sheaves fell the tubing fell about three feet and caught on the elevators; that the tubing did not fall back any more than it had been pulled up; that the tool would not be damaged if the tubing fell only the slack distance; that immediately before the accident Stark had his hand on the tubing and was in the one position to tell whether too much pressure was being applied to the tubing; that the truck was parked at the only place where they could get in; that they used a weight indicator only when they were instructed to use one; that the only unusual thing he saw before the crash was that Stark seemed to be getting kind of impatient.

Alvin Wright, an employee of appellant, testified to the effect that the inside diameter of the tubing was 2½ inches; that the weight of the tubing would be about 35,000 pounds; that the bottom slips on

the Halliburton tool were set by mechanical means when you turned the tubing and lowered it; that the slips are wedge shaped that reach out against the wall of the casing and hold up the weight of the tubing to keep it from moving down the hole; that the top slips operate only when pressure is applied to keep the tool from coming up; that it was found that fluid was circulating without any pressure; that there was no pack off for some reason in the bottom of the hole; that fluid circulated back through the casing; that Stark had one hand on the tubing and was motioning for the driller to pick up; that Groves picked up a little ways and stopped and put the brake down; that Stark motioned to pick up; that this happened more than once; that when Groves had picked up between two and three feet the accident occurred; that Groves had picked up just far enough to have the weight of the tubing on it and the crown block parted; that the truck was backed up within a few feet of the well head; that the tubing came down with a severe blow; that it moved down in the hole pretty hard, down on to the packer; that the tool weighed about 250 to 300 pounds; that the tool would add only 250 pounds of extra weight to the tubing; that the Mobile Well Service equipment looked all right to him; that he saw nothing that looked out of order or dangerous or negligent in what Mobile was doing; that Groves shut down two or three times and Stark kept on demanding more pressure and that the drop of the tubing would hit the packer a good force; that it would put a good force on it.

M. P. Shelton, an employee of appellant, testified to the effect that the packer was set, the Halliburton crew pressured or pumped into the tubing and found there were leaks; that as Groves started up with the tubing he stopped at no direction from Stark, who was wanting Groves to continue pulling on the tubing; that before the necessary height was reached things started falling; that the addition of the Halliburton tool caused only a slight increase in weight; that he supposed the same equipment had pulled the 35,000 pounds of tubing the day before; that it was the practice of Halliburton to clean the tools and dress them up properly after they had been used; that the tool should be in working order before it goes out to the job; that if the tool were working properly it would not jam in the bottom of the well; that it was not the general practice to do nothing about defects and have the next man to use the tool clean it up after he got to the derrick floor and to sandpaper and oil it and beat it with a hammer and put slips back in properly.

R. F. Peterson, District Superintendent for Hunt Oil Company, testified to the effect that he hired Halliburton to do the sand fracturing and the Mobile Well Service for pulling and running tubing and rods; that Mobile Well Service furnished the workover rig—the truck with the pulling unit and tools which consisted of tongs, hooks and blocks and a traveling block and all necessary tools to handle the tubing and rods; that the Mobile crew was practically in the hole with the tubing when he arrived on the morning of March 10, 1955; that the beams of the crown block were running east and west; that he asked Groves if he thought that he was rigged up properly with the truck on the north side of the derrick and that Groves assured him that he had been rigging that way a long time and that it was safe; that he mentioned a weight indicator but it was obvious that Groves did not have any lines on which to put this device; that Groves said he had no place to put a weight indicator, which was obvious; that Groves could have used the Hunt Oil Company crown block if he had so desired; that the Mobile Well Service crown block had 8 inch I beams; that both of the beams were bent after the accident but the one on the south was worse; that there was a sill on the west side of the derrick that had been used for the tie down sill on a different type of unit; that he did not recall suggesting that Groves should have rigged up on the

west side, though he did say that he called Groves' attention to the fact that he never did rig up that way and Groves assured him that it was safe; that he, Peterson, would have put the truck on the west side of the derrick; he admitted that Groves should know more about the Mobile Well Service equipment than anyone else; that this well was a little better than 5,300 feet deep; that the week before, when the tubing was pulled, Mobile used a Hunt crown block, but on further questioning the witness could not be positive about the use of the Hunt crown block, though he believed they did use it; that the job the week before was a rod and tubing job; that the tubing was pulled up to about 3,750 feet to make repairs to a pump; that he could not recall whether Groves had rigged up the same way the week before or not; that he was not present when the accident happened; that the Hunt derrick was in good condition; that he had no conversation with Groves about whether the crown block was adequate; that he was generally familiar with a sand-frac job but it was desirable to call in a specialist; that the Halliburton tool is still in the bottom of the well; that on the following day 100,000 pounds of pressure was used in trying to remove the tool; that this was after the tubing had been dropped with the tool on it; that the Hunt crown block was the stronger; that it was rated at 100,000 pounds capacity; that he estimated the Mobile crown block at 25,000 pounds capacity or less.

Ira Henderson, part owner of the Henderson Drilling Corporation, testified to the effect that there would be an undue strain unless the truck was lined up with the crown block; that it was advisable to have a weight indicator so that you would know at all times how much strain was on the equipment; that normally the service company that provides the pulling machine also furnishes the weight indicator; that the crown block should be the strongest part of the equipment. *He admitted that the signal given by the operator of the spe-* *cialized tool should be followed and that the operator of the pulling equipment is in his hands as to pulling up, letting down, etc.* (Emphasis ours.)

The jury in its verdict found substantially (1, 2, and 3) that immediately before the occasion that resulted in the death of Groves, that Frank Stark directed Groves to pull up on the tubing in the well and that Stark directed Groves to apply an excessive amount of pull on the tubing, and that such excessive amount of pull was a proximate cause of the occurrence made the basis of this suit; (4 and 5) that immediately prior to the occurrence made the basis of this suit the H & M tool of Halliburton had become stuck in the casing of the well and that such tool was in a defective condition; (6) that the defective condition of the tool caused it to become stuck in the casing in the well; (7) that Halliburton could have, in the exercise of ordinary care, discovered the defective condition of the tool before the occurrence made the basis of this suit; (8) and that such company was negligent in furnishing said H & M tool in such defective condition for use in the well; (9) that such negligence was a proximate cause of the occurrence made the basis of this suit; (10) that the Halliburton Company, before putting the tool to use at the well, did not fail to make such inspection of the tool as would have been made by a reasonably prudent person in the exercise of ordinary care under the same or similar circumstances; (11) not answered pursuant to instructions; (12) "Do you find from a preponderance of the evidence that Marvin Groves' continuing to operate the pulling unit to pull up on the tubing at a time when Mobile's equipment would not stand the strain was negligence? Answer 'We do' or 'We do not' ", to which the jury answered "We do not."; (13) not answered pursuant to instructions; (14) that Groves' failure to use the weight indicator was not negligence; (15) not answered pursuant to instructions; (16) that Groves did not fail to know the condition and operational ca-

pacity of Mobile's equipment in use on the day in question; (17 and 18) not answered pursuant to instructions; (19) that Groves failed to warn anyone that Mobile's equipment would not stand the strain; (20) but that such failure was not negligence; (21) not answered pursuant to instructions; (22) that Groves did not use a defective crown block; (23 and 24) not answered pursuant to instructions; (25) "Do you find from a preponderance of the evidence that Marvin Groves' operation of the pulling unit with the axis of the truck at a right angle to the axis of the crown block caused undue strain on the crown block? Answer 'We do' or 'We do not' ", to which the jury answered "We do."; (26) but found that such action was not negligence; (27) not answered pursuant to instructions; (28) "Do you find from a preponderance of the evidence that Marvin Groves knew or should have known, in the exercise of ordinary care, the strain that the crown block would stand? Answer 'We do' or 'We do not.' ", to which the jury answered "We do."; (29) "Do you find from a preponderance of the evidence that Marvin Groves voluntarily exposed himself to a known danger or one that should have been known to him in pulling with a strain that the crown block would not stand? Answer 'We do' or 'We do not.' ", to which the jury answered "We do not."; (30) that the accident in question was not caused solely by the failure of Mobile's crown block; and (31) that Groves' injuries and death did not result from an unavoidable accident. The decree of the court followed the verdict as heretofore stated.

Appellant assails the judgment entered on what it designates as 25 points. It has grouped its first fourteen points under one discussion. These points are substantially to the effect that (1) the court erred because it overruled its motion for an instructed verdict and its motion for judgment non obstante veredicto because there was no evidence of any negligence on the part of appellant at the time of the accident that was made the basis of this suit; (2)

and there was no evidence to prove any act or omission on the part of appellant that was a proximate cause of the accident made the basis of this suit; (3) that the proof tendered was of an accident alone and merely raised conflicting inferences, and there being no direct evidence to prove the greater probability of one inference than another, appellees failed to meet the burden of proof placed upon them to raise fact issues of negligence on the part of appellant proximately causing the accident; (4) that the verdict is not supported by the evidence because there is no evidence that appellant was guilty of any negligence that proximately caused the injuries and death of Marvin Groves; (5) that the verdict has no support in the evidence because there is no evidence of any causal connection between any act or omission on the part of appellant and the injuries and death of Groves, or that any act or omission on the part of appellant proximately resulted in the injuries and death of Groves; (6) that the verdict is not supported by the evidence because the evidence showed only that the crown block broke, which resulted in the injuries and death of Groves, which was proof of an accident alone and merely raised conflicting inferences, and there bing no direct evidence proving the greater probability of one inference than another, appellees failed to meet the burden of proof placed upon them to raise fact issues of negligence on the part of appellant proximately causing the accident; (7) that the verdict is not supported by the evidence because there is no evidence that appellant breached any duty that it owed to Groves, so as to give rise to any tort liability on the part of appellant; (8 and 9) because the court failed to disregard certain findings of the jury in that there was no evidence to support the affirmative findings of the jury in answer to special issues Nos. 1 to 9 inclusive and in failing to set aside the affirmative answers of the jury to Issues Nos. 1 to 9 inclusive, because they were against the great weight and preponderance of the evidence; (10) because the verdict is against the overwhelming preponderance of the evidence

because the overwhelming preponderance of the evidence was that appellant was not guilty of any negligence that proximately caused the injuries and death of Groves; (11) because the overwhelming preponderance of the evidence was that there was no causal connection between any act or omission on the part of appellant and the injuries and death of Groves; (12) because the verdict is against the overwhelming preponderance of the evidence because the overwhelming preponderance of the evidence was that the crown block broke which resulted in injuries and death of Groves, which was proof of an accident alone, and merely raised conflicting inferences, and there being no direct evidence to prove the greater probability of one inference than another, appellees failed to meet the burden of proof placed upon them to raise fact issues of negligence on the part of appellant proximately causing the accident; (13) that the verdict is against the overwhelming preponderance of the evidence because the overwhelming preponderance of the evidence was that appellant did not breach any duty that it owed to Groves, so as to give rise to any tort liability on the part of appellant; (14) that the verdict is against the overwhelming preponderance of the evidence because the overwhelming preponderance of the evidence was that the injuries and death of Groves were solely caused by the failure of Mobile's crown block.

In appellant's brief we find the following argument:

"It is undisputed that Marvin Groves died because Mobile's crown block failed. The crown block was owned by his employer, Mobile. Pursuant to its agreement with Hunt, Mobile furnished the crown block for the job on the well. Groves was thoroughly familiar with it and supervised its placement in the top of the derrick by his crew. The entire pulling unit, consisting of the crown block, cables, winch truck and elevators, was rigged, and the crown block placed at the top of the derrick by the Mobile crew, before any

Halliburton man ever came to the job site. It is clear that the crown block, when it parted, was incapable of withstanding the strain upon it, whether that strain was slight or great. These statements cannot be questioned.

"There is absolutely no testimony in the record that there was any undue, abnormal or excessive strain being applied at the time that the crown block separated. Even appellee Nugent testified that he did not see or hear anything unusual until the accident occurred. There is no explanation why Groves stopped lifting, as he said nothing. The other witnesses testified that there was no unusual or excessive strain being applied up until the time that Mobile's crown block broke. In fact, the tubing had not been lifted to a point any higher than it was prior to the time that it was lowered in order to set the packer. Groves had no more than the total weight of the tubing on the crown block at any time before the crown block broke.

"Appellees cannot deny that Groves' death was due to the failure of the crown block. They cannot contend that it was a piece of equipment furnished by appellant nor deny that it was Mobile alone that was obligated to furnish a safe crown block. Appellees' entire case rests upon proof that the same crown block had been used on other occasions without disaster.

"On the other hand, Groves, himself, was operating the pulling unit that that was exerting the pull on the crown block. The exact amount of the strain was not known, for a weight indicator was not being used. Groves did not use a weight indicator even though Mobile owned one. Operators of such units ordinarily use a weight indicator to determine the exact amount of the strain. Groves was rigged up so that he was pulling crosswise to the crown block. According to witnesses with

great experience in the oil fields, this was calculated to cause an increased strain on the crown block and was not normal. Hunt's stronger crown block lay idle at the well site because Groves chose not to use it.

"The jury found for appellees that appellant's employee, Stark, negligently directed Groves to apply an excessive pull on the tubing which was a proximate cause of the crown block breaking. These findings were in Special Issues Nos. 1, 2 and 3. There was absolutely no evidence, or the evidence was insufficient, to support the jury's findings and the submission of these issues. The undisputed evidence was that a normal strain was being exerted. Appellee's proof of an excessive pull rested solely on the happening of the accident."

■ We are not in accord with the foregoing views. It is true that much of this testimony came from men experienced in oil field work and perhaps much of the testimony tendered could be classified as expert testimony, but such evidence is evidentiary only. See Hood v. Texas Indemnity Co., 146 Tex. 522, 209 S.W.2d 345, points 1–3, at page 346.

Testimony was tendered to the effect that the H-M tool used in this operation was some 5½ feet long and that its weight was estimated by Stark as from 85 to 100 pounds and by the witness Wright at from 250 to 300 pounds; that the instrument was designated as a H-M packer as the "H" stood for hydro and the "M" for mechanical; that it was so designed that one set of slips was set by mechanical manipulation and the other slips set by hydraulic pressure. The slips on the bottom of the packer were set by mechanical means in that the tubing is turned and lowered, which caused the wedged shaped slips to reach out against the wall of the casing and hold up the weight of the tubing to keep it from moving down in the hole; that these bottom slips in holding up the weight of the tubing on the bottom end of the packer cause the rubber packing elements to seal off the space between the tubing and the casing. These mechanical bottom slips keep the tool and tubing from going further down in the hole but have nothing to do whatsoever with keeping the tubing from being raised or going up in the hole. The top slips operate by hydraulic or fluid pressure. The top slips do not move unless there is pressure on the inside of the tubing and a difference in pressure inside the tubing than that between the tubing and the casing. The difference in pressure inside the tubing would cause the slips to push out against the casing and prevent the tubing from coming out of the hole; that if there was no pressure in the tubing or no difference in pressure between the inside of the tubing and the casing, springs would keep the slips in a normal position; that if pressure was applied and then released, the slips then go back into the normal position; that the bottom or mechanical slips are unset by the tubing being picked up by the driller and this automatically causes the bottom slips to unseat.

Testimony was tendered to the effect that Groves was in charge of his crew and that they went to the well site on March 9th, the day before the accident occurred. On March 9, 1955, after rigging up, Groves' crew pulled the tubing. The week before this crew had pulled the tubing on this well and replaced some pieces with no trouble. The Mobile Well service equipment was in good condition; that the Mobile truck was backed into the only position it could get in, and that there was nothing unusual for the cable to be at a slight angle with the pulleys; that the manner in which the rigging was done did not place any more strain on the crown block than any other method; that the Halliburton man brought out the tool on March 9th, and that Stark, the Halliburton man, was in complete charge of the tool; that the Halliburton tool was rusty and Stark beat on it with a sledge hammer before they started into the hole; that he was sanding some little things on the tool

that were supposed to work free and put some oil on it and then hammered some more with a sledge hammer and told the Mobile crew to lower it in the hole; that Stark tested the tool at about 300 feet and said it was working all right; that he left and the Mobile crew went on down to 2,200 feet that afternoon; that the Mobile crew came back the next morning and ran the tubing all the way to the bottom; that when they got to the bottom Stark set the bottom slips on the sand-frac tool; that after the tool was set at the bottom of the well the Halliburton crew started pumping and found the tool was leaking. Just before noon they found the sand-frac tool was leaking and they wanted Groves to unset it; that the Mobile crew had started to lunch and Groves was called back; that when he was operating the pulling unit Groves was about ten feet from the hole; that Stark wanted Groves to unset the tool so he could reset it; that Groves made a quarter turn on the pipe; that Stark then signalled Groves to pick up on the tubing and Groves pulled on the tubing and then he locked the brake; that Stark kept motioning with his hand to come on up and Groves locked down again; that Stark said to come on out and he did that three times and the sheaves fell and hit Groves; that the fourth time Groves started operating his pulling unit Stark was motioning to come on up with it; on the fourth time the sheaves came out of the crown block; that in operating the levers Groves would not have any feel of any pressure involved; that Stark would be in a better position, with his hand on the tubing, to tell how much strain was being applied to the tool in the bottom of the well; that Stark was in position to tell whether the tool was stuck on the bottom and knowing what he did, he kept on signalling for more pressure.

It is our view that from reading the testimony as a whole and from all of the facts and surrounding circumstances we cannot say that the accident was unexplained. We think the evidence tenders the issue that the Halliburton tool was brought to the well site in a defective condition and that it required some adjustment before Stark was ready to use it, and there is testimony to the effect that the tool should not have been brought to the well site to be used in the condition that it was in. It appears that Stark made the adjustments on the tool that he thought were necessary to be made before letting it be attached to the tubing to be placed in the well; that he caused the tool to be tested at some 300 feet in the well and it appeared to work; however, in considering Stark's testimony it must be borne in mind that he was an interested witness and his credibility and the weight to be given his testimony were matters for the jury to determine. The jurors did not have to believe his story that he made proper and suitable repairs to the tool before it was attached to the tubing. In fact, Stark admitted that the tool should not have been permitted to get in such shape that he would have to oil and sandpaper it, and he further admitted that lots of times he had to put tools in wells and had told them to give it the works without knowing that things were safe, all of which was damaging to appellant because Stark was in charge of the tool and was directing its use. In this connection it must be borne in mind that the jury were the judges not only of the facts proved but of the inferences to be drawn therefrom, provided such inferences were not unreasonable. See Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194 point 6, at page 199. Moreover, the Mobile well service workover rig had successfully pulled the tubing on this well on two prior occasions. The only difference on March 10, 1955, was that there had been attached to the tubing this tool weighing at most approximately 250 to 300 pounds. We think it was reasonable for the jury to infer that this additional weight should not have presented any obstacle to the raising of the tubing unless the tubing with the tool attached did get stuck. No explanation was offered as to why it should take an additional 10 or 12 thousand pounds of

pressure above the weight of the tubing to lift it out with this tool attached; however, testimony was tendered to the effect that this particular rig and crown block had supported weights greatly in excess of 50,000 pounds. There is nothing in the record to suggest that the crown block was defective before the date of the accident on March 10, 1955. All of the parties knew that the crown block had lifted the tubing the day before and there was no occasion to think that it would not lift the tubing with the additional 250 or 300 pound weight. It seems to us that there is no explanation for the failure of the tubing to come out of the well unless it was occasioned by the defect in the Halliburton tool. The tubing was smaller than the casing and there is nothing in the record to indicate that the tubing would hang in any manner. Also, testimony was tendered to the effect that the rig was set up in the only manner that was feasible by reason of obstructions on the other sides of the derrick, and it is without dispute that the method of rigging up did not interfere with the raising and lowering of the tubing before the attempt was made on the afternoon of March 10, 1955. Testimony was tendered to the effect that Groves, who was operating the pulling unit, applied pressure two or three times and each time shut down. In view of the fact that he had pulled the tubing the day before without any difficulty, we think that his action in this behalf indicated that he was being very cautious. There was evidence that Groves was unable to pull the tubing up more than enough to take out the slack, but Stark continued to insist on the application of more pressure until the crown block was caused to part. The parting of the crown block could have been occasioned by nothing other than the application of excessive pressure. It is true that Stark testified to the effect that Groves did not apply enough pressure to unseat the packer, but it is also true that Groves shut off his power and applied his brakes at least three times before making the final pull that resulted in breaking the crown block which had theretofore withstood pressures up to 100,000 pounds. There is testimony that Stark kept motioning to Groves for more pressure in the face of the fact that Groves had shut down his power at least two and possibly three times and that Stark made no inquiry of Groves as to his reasons for shutting down the power. Under all of the testimony tendered and the surrounding facts and circumstances, we think the jury had a right to conclude or infer that Stark, in the exercise of ordinary care, should have made inquiry as to why Groves had stopped the machinery two or three times and the jury could have properly concluded that Stark should have made such inquiries as to why Groves had stopped the machinery two or three times before directing the application of more pressure and such a conclusion would lead inescapably to the inference of negligence in failing to survey the situation before giving further directions to the operator of the power device. It seems to us that Groves' conduct in these circumstances was abnormal and common prudence would dictate to Stark the making of some inquiry about the reason for his repeated shutting off the power after applying it.

■ We recognize the rule that the mere happening of an accident is not enough to support findings of negligence, but we believe that the testimony tendered in this cause, together with all of the facts and surrounding circumstances, is sufficient to tender issues 1 to 9 inclusive, and that the testimony is sufficient to sustain the jury's verdict thereon. That leads us to say that as a reviewing court it is our duty to consider the evidence and the inferences properly to be drawn therefrom in the light most favorable to the party obtaining the verdict, and it is our duty in considering controverted issues of fact to accept as true that testimony which tends to support the verdict. 3–B Tex.Jur. 370–372. Moreover, "where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circum

stances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.' " See Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511, 514, points 8 and 9, writ ref. That leads us to say that in considering testimony tendered by appellant and that of appellees, together with all of the facts and surrounding circumstances, we cannot say that such testimony is harmonious and consistent to the effect that the tool used was not defective and that such defect, plus the excessive pressure directed by Stark, was not negligence and not a proximate cause of the injuries and death of Groves. We think the factual situation here supporting negligence and proximate cause is much stronger than the factual situation before our Supreme Court in Washington v. Missouri K. & T. Ry. Co., 90 Tex. 314, 38 S.W. 764; and Houston E. & W. T. Ry. Co. v. Boone, 105 Tex. 188, 146 S.W. 533. See also Shiflet v. St. Louis S. W. Ry. Co., 18 Tex.Civ.App. 57, 44 S.W. 918; St. Louis S. W. Ry. Co. v. Shiflet, 94 Tex. 131, 58 S.W. 945; Bock v. Fellman Dry Goods Co., Tex.Com.App., 212 S.W. 635; Davis Transport, Inc., v. Bolstad, Tex.Civ.App., 295 S.W.2d 941; Burlington R. I. RR. Co. v. Ellison, 140 Tex. 353, 167 S.W.2d 723; Gulf C. & S. F. Ry. Co. v. Bouchillon, Tex. Civ.App., 186 S.W.2d 1006 (writ ref. w. m.).

Appellant relies on Texas & Pac. Coal Co. v. Kowsikowski, 103 Tex. 173, 125 S.W. 3; Davis v. Castile, Tex.Com.App., 257 S.W. 870; McClish v. R. C. Young Feed & Seed Co., Tex.Civ.App., 225 S.W. 2d 910; Comet Motor Freight Lines v. Holmes, Tex.Civ.App., 175 S.W.2d 464; Rounsaville v. Bullard, 154 Tex. 260, 276 S.W.2d 791; Phillips v. Burns, 151 Tex.

614, 252 S.W.2d 927; A. C. Burton Inc. v. Stasny, Tex.Civ.App., 223 S.W.2d 310; 30–B Tex.Jur. 177. Needless to say, we cannot enter into a discussion or comparison of the foregoing cases. We think it is sufficient here to state that the testimony which we have related shows that the decisions cited by appellant are not controlling here. Points 1 to 14 inclusive are overruled.

■ Bearing in mind all of the testimony tendered, together with the undisputed surrounding facts and circumstances, we cannot say as a matter of law that Groves voluntarily exposed himself to the danger known to him or should have been known to him, nor that he was guilty of negligence proximately causing his own injuries and death as a matter of law. McAfee v. Travis Gas Corporation, 137 Tex. 314, 153 S.W.2d 442; Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W.2d 172; Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60. Since the evidence is without dispute that the Halliburton man was in charge of the tool in question and was familiar with the way it operated, it was fair for Groves to assume that Stark believed that the tool would operate successfully in the well and that if it did so, it would do the work that it was supposed to do and that mechanical construction would make the necessary adjustment so as to enable the application of power by Groves to raise the tubing and the tool as directed by Stark. We think the evidence was sufficient to tender Special Issues Nos. 12, 14, 16, 20, 22, 26 and 29, and the jury's answers thereto are not against the great weight and overwhelming preponderance of the evidence. That leads us to say that we have carefully considered appellant's points 15 to 21 inclusive and each is overruled.

Appellant's 22nd point is substantially that the court erred in overruling appellant's motion for judgment on the jury verdict and to disregard certain findings of

the jury. Under this point we find the following statement in appellant's brief:

"Heretofore under our Points 15 through 21 we have demonstrated by controlling authorities that appellant was entitled to judgment as a matter of law in the trial court because all of the evidence in the case conclusively demonstrated that the deceased, Marvin Groves, was contributorily negligent and voluntarily exposed himself to danger. However, because the trial court refused to instruct a verdict and submitted the case to the jury, we now have jury findings which show that, not only as a matter of law, but also, as a matter of fact finding by the jury, appellant is entitled to judgment.

"By the affirmative findings of the jury to the unpredicated issues Nos. 25 and 28, two things become crystal clear:

1. Marvin Groves' operation of the pulling unit with the axis of the truck at a right angle to the axis of the crown block caused undue strain on the crown block; and,

2. Marvin Groves knew, or should have known, in the exercise of ordinary care, the strain that the crown block would stand.

"It is undisputed in this record that at the time of and immediately before the accident in question Marvin Groves was operating his own pulling unit and by such operation was placing a strain on the crown block with the pulling cables. When his crown block reached the limit of its capacity, its longitudinal beams buckled, thus allowing the heavy sheaves, over which the cables traveled, to come tumbling down upon him from the top of the derrick.

"Not only did Groves place an undue strain on the crown block from the manner in which he and his crew rigged the pulling unit, but he was applying the strain on the cables with the winch truck drum that he was operating just before the crown block buckled. The jury has said by its findings that he knew or should have known the strain that his own equipment, namely, the crown block, would stand."

Appellant relies on the doctrine announced in Robert E. McKee, General Contractor v. Patterson, 153 Tex. 517, 271 S.W.2d 391; Hodges v. Nix, Tex.Civ.App., 225 S.W.2d 576 (n. r. e.); Hancock v. Sammons, Tex. Civ.App., 267 S.W.2d 252 (n. r. e.); a. c. Burton Co. v. Stasny, Tex.Civ.App., 223 S. W.2d 310 (writ ref.); Latimer v. Walgreen Drug Co., Tex.Civ.App., 233 S.W.2d 209.

We do not agree with the conclusions reached by appellant because we think the record here shows that the factual situation here is vastly different from the situation existing in McKee v. Patterson, supra, as well as the other cases cited. Moreover, since the jury answered Issue No. 25 in the affirmative, or "We do," the jury was instructed to answer Issue No. 26, which was: "Do you find from a preponderance of the evidence that such action on the part of Marvin Groves, if you have so found, was negligence?", to which the jury answered "We do not." So, with reference to Issue No. 25 we have a direct finding of the jury that Groves' conduct in this respect was not negligence and therefore could not have been a proximate cause of the accident.

With reference to Issue No. 28 the jury was instructed in effect that if they answered Issue No. 28 affirmatively, which they did, to the effect that Groves knew or should have known, in the exercise of ordinary care, the strain that the crown block would stand, the jury was instructed in that event to answer Issue No. 29, which was: "Do you find from a preponderance of the evidence that Marvin Groves voluntarily exposed himself to a known danger

or one that should have been known to him in pulling with a strain that the crown block would not stand," to which the jury answered "We do not," so here again we have the jury acquitting Groves of negligence and therefore his failure in this behalf could not have been a proximate cause of the accident under the jury's findings.

Bearing in mind the foregoing answers of the jury, together with all of the evidence tendered, together with all of the surrounding facts and circumstances, there is a strong presumption of the exercise of due care on the part of the deceased person. The foregoing rule announced by our Supreme Court in Boaz v. White's Auto Stores, 141 Tex. 366, 172 S.W.2d 481, has never been changed. We think that Groves' repeated shutting off of the power when the Halliburton tool refused to release itself is strong, affirmative evidence that Groves was not negligent; otherwise, the jury would have convicted him of negligence and found it to be a proximate cause. We think that Groves' conduct during the entire operation indicates that he was taking ordinary precaution for his own safety, and the jury had the same view. See Lee v. International & G. N. Ry. Co., 89 Tex. 583, 36 S.W. 63, and Hines v. Richardson, Tex.Civ.App., 232 S.W. 889 (writ ref.).

In view of the fact that the jury acquitted Groves of negligence with reference to Issues Nos. 25 and 28, we see no conflict and we think Little Rock Mfg. Co. v. Dunn, 148 Tex. 197, 222 S.W.2d 985, answers adversely the contentions of appellant. As we view the verdict in its entirety, we think it shows that the jury was of the view that Groves was not guilty of doing anything improper in following the signals that were being given him by Stark.

Appellant in its brief says:

"While the jury found by its affirmative answers to Special Issues Nos. 7, 8 and 9 that: Appellant could have discovered the defective condition of the tool; appellant was negligent in furnishing said defective tool; and that such negligence was a proximate cause of the accident; but found in Special Issue No. 10 that: Appellant did not fail to use ordinary care in making a reasonable inspection.

"Issues Nos. 8 and 9 are predicated on No. 7. Special Issue No. 7 is in irreconcilable conflict with Special Issue No. 10 because:

"1. Special Issue No. 7 finds that Halliburton could have discovered the defective condition of the tool; but

"2. Special Issue No. 10 finds that appellant did not fail to use ordinary care in making a reasonable inspection.

"Since Special Issues Nos. 8 and 9 are predicated on No. 7, they must be disregarded because Special Issue No. 7 is in irreconcilable conflict with Special Issue No. 10," citing Hancock v. Sammons, Tex.Civ.App., 267 S.W.2d 252 (n.r.e.).

In appellees' brief we find the following answer to appellant's contention.

"Coming now to the question of the supposed conflict between Special Issue No. 7 and Special Issue No. 10, it can readily be demonstrated that such conflict does not exist. In the former, it was found that Halliburton could have discovered the defective condition of the tool and in the latter the negative answer simply means that the jury failed to find from a preponderance of the evidence that Halliburton failed to use ordinary care in making a reasonable inspection. This is nothing more than a conclusion on the part of the jury that appellees had failed to sustain their burden of proof in this regard. It is not a finding that Halliburton actually made a proper inspection. However, if it could be so con-

sidered, there would still be no conflict. The Halliburton tool was admittedy brought to the well site in a defective condition. The only testimony that proper repairs had been made came from an interested witness, Stark, who was an employee of appellant. The jurors were not required to accept his testimony to the effect that he did the repair work properly.

"In view of Stark's admission that lots of times he had permitted this type of operation to go forward without knowing that things were safe, the jurors could have believed that he had actual knowledge of the defect. When this admission is coupled with the fact that it is undisputed that the Halliburton tool arrived in a defective condition, which was contrary to the customary practices of appellant and in view of the fact that an interested source provided the testimony about making repairs, the jurors could readily have concluded that the tool was put in the well in a defective condition and that Stark knew such to be the case. It fell within the province of the jury to decide whether Stark actually knew what a proper inspection would have disclosed. There is certainly no finding of the jury that would militate against this conclusion. In no manner has the jury found that Stark did not know the actual condition of the tool. It would certainly require some such finding in order to bring about even an apparent conflict. There are other reasons why this contention of appellant may not properly be sustained. It is, of course, the duty of a reviewing court to reconcile any seeming conflict that may appear to exist. It may be observed that Special Issue No. 7 makes inquiry about whether appellant could have discovered the defective condition of the tool before the occurrence made the basis of this suit,

while Special Issue No. 10 inquires about inspection of the tool before it was put to use at the well. Obviously different time elements are involved. Assuming for the purpose of argument that Stark did make a proper inspection of the tool before it was inserted in the well, the jurors could very properly have concluded that he should have discovered the fact that it was in a defective condition before the crown block was caused to part from the manner in which it responded to the effort to pull the tubing from the hole. The significance of such time variations is adequately illustrated by Thompson v. Railway Express Agency (Tex.Civ.App. Galveston) 206 S.W.2d 134, writ ref. n.r.e.; Houston v. Shaw Transports Co. (Tex.Civ.App. Galveston) 296 S.W.2d 631; and Story v. Partridge (Tex.Civ.App. Ft. Worth) 298 S.W.2d 662, writ ref. n.r.e.

"Moreover, it may be observed that none of the findings which are claimed to be in conflict in the case at bar would require or permit a judgment in favor of appellant. Specifically, the answer of the jury to Special Issue No. 10 would not and could not support a judgment in favor of Halliburton." See Little Rock Furniture Mfg. Co. v. Dunn, 148 Tex. 197, 222 S.W.2d 985, points 13, 14, 15.

We are in accord with the foregoing views. It is our view that appellant's 22nd point must be overruled.

Appellant's 23rd point is that the court erred in overruling its objections to Special Issues Nos. 2 and 3 because there was no pleading to support the submission of these issues. We overrule this contention for reasons which we shall hereafter briefly state.

We have previously set out grounds of negligence on which appellees

relied. There was no special exception to the allegations therein contained. In the absence of special exception to the petition, it will be liberally construed in the pleader's favor. See Scott v. Gardner, 137 Tex. 628, 156 S.W.2d 513, points 1 and 2, 141 A.L.R. 50.

■ Moreover, as we understand the record there was no objection in the trial court to the admission of evidence with respect to the application of pressure by means of pulling, and certainly counsel for appellant were not misled or surprised in any manner in this behalf, because pulling is just one method of exerting pressure, and we think appellant's argument under this point is strained. We believe that appellant's argument in this behalf must fall under Rule 434, Texas Rules of Civil Procedure. See also Laurel Oil Co. v. Stockton, Tex.Civ.App., 281 S.W. 1106, writ dis.; City National Bank of San Saba v. Penn, Tex.Civ.App., 92 S.W.2d 532, 533 (no writ history); McMillan v. Rutherford, Tex. Civ.App., 14 S.W.2d 132 (no writ history); Bell v. Bell, Tex.Civ.App., 135 S.W.2d 546, (no writ history); Fowler Commission Co. v. Charles Land & Co., Tex.Com.App., 248 S.W. 314.

■ Appellant's 24th point is substantially that the court erred in refusing to give defendant's special requested instruction No. 1 in connection with the submission of Special Issue No. 29 of the court's main charge to the jury. Issue No. 29 has previously been sent out, as well as the jury's answer thereto. Appellant's instruction reads as follows: "You are instructed with the foregoing issue that the necessity of performing his duties and of earning a livelihood was not such an economic compulsion as to render involuntary Marvin Groves' action." It is appellant's contention that "without the accompanying instruction with Special Issue No. 29, the jury very well could have reasoned that economic compulsion of the plaintiff in

working to earn a livelihood would be sufficient reason for their negative answer to the issue. The Texas Supreme Court has recently held that economic compulsion or constraint does not render involuntary a workman's choice to expose himself to danger. The Supreme Court's language in [Robert E.] McKee [General Contractor] v. Patterson, [153 Tex. 517] 271 S.W.2d 391, 397, clearly shows that appellant was entitled to the requested instruction."

Our view of this point is that under all of the testimony tendered, and bearing in mind the shortness of the time under which the accident happened, there was no necessity for any type of instruction with regard to the meaning of voluntary exposure because voluntary exposure is a term that could readily be understood by any jury of average laymen. Groves had been in the business of oil field work for some time. He had operated the equipment and pulled the tubing the day before and we think that appellant's contention that the jury might have reasoned that economic compulsion in working to earn a livelihood would be sufficient reason for finding that Groves did not voluntarily expose himself to the hazard is speculative. There is nothing in the record to show that the jurors did indulge in such reasoning or speculation. Again, this contention must fail under the provisions of Rule 434, T.R. C.P. Moreover, we do not think that such special instruction meets the test as laid down in Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W.2d 172; Boaz v. White's Auto Stores, 141 Tex. 366, 172 S.W.2d 481. See also Ft. Worth & D. C. Ry. Co. v. Capehart, Tex.Civ.App., 210 S.W.2d 839, n.r.e. Accordingly, appellant's 24th point is overruled.

We have carefully considered appellant's 25th point and we are of the view that it does not present error and it is overruled.

For the reasons heretofore expressed, the judgment of the trial court is affirmed.