Irene S. HENDERSON et vir, Petitioners,

v.

FORD MOTOR COMPANY et al.,
Respondents.

No. B–4332.

Supreme Court of Texas.

Nov. 20, 1974.

Rehearing Denied Feb. 19, 1975.

Kronzer, Abraham & Watkins, W. James Kronzer, Houston, for petitioners.

Vinson, Elkins, Searls, Connally & Smith, B. Jeff Crane, Jr., and Daniel A. Hyde, Baker & Botts, Finis E. Cowan, Houston, for respondents.

REAVLEY, Justice.

This is a products liability case which raises questions of proof of a defective design and the defense to strict liability when the injured claimant has continued to use the product after discovery of the risk of doing so. Irene S. Henderson was badly hurt when, because she could not reduce the speed of her automobile, she intentionally drove it into a metal pole. She brought this suit against the manufacturer (Ford Motor Company) and her dealer (Snelling Motor Company). Mrs. Henderson obtained judgment against the defendants in the trial court; the Court of Civil Appeals reversed that judgment and remanded the case for retrial. 500 S.W.2d 709. Mrs. Henderson comes here contending that retrial is not justified because the evidence raises no issue of her assumption of the risk and because issues as to her negligence constitute no defense to strict liability. Ford Motor Company (and Snelling) come here contending that no liability is justified because there is no evidence of defective design. All of the stated contentions are upheld by this Court.

On April 15, 1969 Mrs. Henderson was driving her 1968 Lincoln Continental in Houston city traffic. After accelerating to enter a freeway, she found that the speed of the car was not responsive to her control. Her first impression was that the problem was with the brakes. She drove the car from the freeway at the first exit and onto South Post Oak Road, continuing her efforts to stop. She determined that the accelerator pedal was not depressed. She pumped the brake and pushed with both feet against the brake pedal, but the speed continued. Seeing a busy intersection ahead and recognizing the peril to other persons, she drove onto the esplanade in the center of the street and finally crashed into the large signal light pole.

The Continental automobile had been purchased from Snelling Motor Company seven months earlier; it had been driven approximately 9,000 miles. When the wreckage was examined six days later by Dr. William Tonn, the accelerator linkage to the carburetor was found to be jammed as the result of the indentation of the pole into the engine area, but no pre-accident fault was indicated in the linkage. Two years later a mechanic, Levertt LaRue examined the wreckage. He found noth-

ing wrong with the carburetor linkage but when he looked into the carburetor itself, he found a piece of rubber between the throttle blades and the bore of the chamber of the carburetor. The piece of rubber turned out to be part of the gasket which was originally installed around the bottom of the air filter housing where that housing was seated on top of the carburetor.

The purpose of the air filter is to prevent dirt and foreign objects from entering the carburetor as oxygen and fuel are being drawn into the combustion chambers of the engine. The lightweight filter housing requires some type of rubber or fibre gasket along the area where it fits upon the carburetor housing. In the engine installed in Mrs. Henderson's automobile, which Ford designated as model number 462, the gasket was glued into a trough or groove around the underside of the air filter housing. An alternative design, the one used on the successor model 460 Lincoln engine, substitutes a separate fibre gasket (on and around the carburetor housing at the place where the filter housing is seated) for the gasket previously fixed in the filter housing.

The chief contention of the plaintiff at the trial was that the gasket was not properly placed in its groove during manufacture, that it protruded from the groove when first sold to plaintiff and was finally cut free, that the piece then lodged in the carburetor and held open the gas feed during Mrs. Henderson's frightful ride. The jury, however, answered in the negative the issues of whether the gasket was defectively installed by Ford or defectively installed when sold by Snelling. The judgment for plaintiff was based upon jury findings that the design of the air filter housing was defective and that this design defect was the producing cause of Mrs. Henderson's damages.

The Court of Civil Appeals majority held that the defendants were entitled to have the jury determine issues as to Mrs. Henderson's contributorily negligent conduct following her discovery that the car was not functioning correctly. Under that holding if the jury determined that a person in the exercise of ordinary care would have avoided injury by stopping the car earlier through the proper use of the brakes or by shifting the transmission control to neutral or by turning off the ignition, the defendants would not then be liable. This holding is understandable because of the writing of this Court in Shamrock Fuel & Oil Sales Co., Inc. v. Tunks, 416 S.W.2d 779 (Tex.1967). This writ was granted for the purpose of resolving some of the uncertainty as to the defenses to strict liability when predicated upon conduct of the complainant following discovery of the defect.

## CONTRIBUTORY NEGLIGENCE

■ Some courts allow contributory negligence of the user as a defense to strict liability in tort against the manufacturer of a defective product, and no distinction is made as to whether the negligent conduct occurs before or after discovery of the defect by the user. In those states the failure to discover or foresee dangers which the ordinarily careful person would have discovered or foreseen, as well as negligent conduct after discovery of the danger and in the use of the product, constitutes a defense to an action based on strict liability. Stephan v. Sears, Roebuck & Co., 110 N.H. 248, 266 A.2d 855 (1970); Dippel v. Sciano, 37 Wis.2d 443, 155 N.W.2d 55 (1967). This Court has rejected for Texas the defense of negligent failure to discover a defect or to foresee the danger. Shamrock Fuel & Oil Sales Co. v. Tunks, supra; McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.1967). We reaffirm that holding and believe it to be the prevailing view. See: Williams v. Brown Mfg. Co., 45 Ill.2d 418, 261 N.E.2d 305 (1970); 2 Frumer and Friedman, Products Liability, § 16 A(5)(f).

■ This Court in 1967 left open the question of whether contributory negli-

gence would be a defense if the subpar conduct of the user followed discovery of the defect. We now hold that contributory negligence is not a defense under those circumstances in a strict liability action. In a recent opinion, delivered after the Court of Civil Appeals opinion in the instant case, this Court held that contributory negligence on the part of a claimant is no defense in a strict liability action for damages caused by a vicious animal. Marshall v. Ranne, 511 S.W.2d 255 (Tex.1974). No distinction was made there between a failure to discover the nature of the animal and a careless encounter with its viciousness after discovery. The conduct in question in that particular case occurred after full knowledge of the viciousness of the beast. We will apply the same rule for the defense of strict liability whether the risk encountered is a dangerous animal or a defective product.

## ASSUMPTION OF RISK

■ Assumption of the risk, or volenti non fit injuria, remains a proper defense in a strict liability action. The prevailing trend of the courts seems to be to follow Comment *n* of § 402A of the Restatement Second, Torts, which states:

> *n.* *Contributory negligence.* Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases . . . applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and

nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.

The Restatement here joins subjective appreciation of the danger with objective lack of care in unreasonably continuing use of the product. It is not unusual for assumption of risk and contributory negligence to be treated as overlapping. 2 Harper and James, Torts, 1162 (1956); Keeton, Assumption of Risk in Products Liability Cases, 22 Louisiana L.Rev. 122, 131, 143 (1962). The overlapping may have some relation to a dislike for the defense of assumption of the risk and the efforts to have it abolished. See generally: Prosser, Torts, 454 (4th ed. 1971). When the rule described in Comment *n* of § 402A of the Restatement, above, is followed, the courts which do so are justified in saying that it makes no difference whether the defense is labeled contributory negligence or assumption of the risk. See Ellithorpe v. Ford Motor Co., 503 S.W.2d 516 (Tenn. 1973); Ferraro v. Ford Motor Co., 423 Pa. 324, 223 A.2d 746 (1966). Neither label would be entirely appropriate under previous Texas decisions.

The Restatement rule requires the defendant to prove more than contributory negligence after discovery that some defect exists. It requires proof of the elements of assumption of risk, or volenti non fit injuria as that defense is known in the Texas cases, with the additional proof that the plaintiff's voluntary exposure to the risk was unreasonable. To illustrate, let us suppose that plaintiff takes his spanking-new car to the country for a test drive. Its brakes have been defectively designed *and* manufactured. He discovers along the way that he has no brakes at all, but the car rolls harmlessly to a halt on the side of the country road. There is no danger in plaintiff leaving his car and walking to the garage, but he has important engagements to make and proceeds to drive his new car very cautiously toward the garage. He does not make it; let us say that a horse walks onto the road. The elements of as-

sumption of risk are clearly present, but there remains the fact issue of whether plaintiff's conduct was reasonable.

The United States Court of Appeals for the Fifth Circuit has had several cases before it which required a decision as to the Texas law at this particular point. E.g., Borel v. The Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir. 1973); Messick v. General Motors Corp., 460 F.2d 485 (5th Cir. 1972). In *Messick* the plaintiff knew of the defect in the front suspension system of his automobile and had been told by a mechanic that if he continued to drive the car it would kill him. He did continue to drive it and, though he was not killed, he was injured. He argued that his use of the automobile after knowledge of the danger was reasonable because of economic duress since he depended upon his car in his work as a salesman and he was unable to obtain any substitute transportation. The jury was instructed:

> "[A] person is not at fault in voluntarily exposing himself to a known and appreciated danger, if; under the same or similar circumstances, an ordinarily prudent person would have incurred the risk which such conduct involved. Thus, if there was some reasonable necessity or propriety which justified Plaintiffs in exposing themselves to the known risks involved, or if by the exercise of care proportionate to the danger Plaintiffs might reasonably have expected to have avoided the danger, or if there was no other reasonable course open to them but to make continued use of this automobile, then Plaintiffs cannot be found to have voluntarily exposed themselves to the risk." 460 F.2d 493.

The Fifth Circuit upheld this instruction and decided that the Supreme Court of Texas would agree with that statement of the law. We do not. Assumption of risk is the defense; contributory negligence or failure to act reasonably is not.

■ We do recognize that the assumption of risk defense requires a *voluntary*

encounter with the danger or risk—which means by free and intelligent choice. Marshall v. Ranne, 511 S.W.2d 255 (Tex. 1974); Wood v. Kane Boiler Works, 150 Tex. 191, 201, 238 S.W.2d 172, 178 (1951); Biscayne Texas Properties v. Miner, 502 S.W.2d 225 (Tex.Civ.App.1973, writ ref'd n. r. e.); Noel: Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk, 25 Vand.L.Rev. 93, 126 (1972). This is to say that a plaintiff may have elected from some alternatives to face the danger without being barred from subsequent recovery, but it does not mean that a fact issue of reasonableness is always an element of the defense.

No decision has been made by this Court to rule the case where the defendant manufacturer should have anticipated that the dangerous design would cause physical harm to one in the course of use similar to that which caused plaintiff's injury and notwithstanding the plaintiff user's knowledge of the danger. See generally Bolm v. Triumph Corp., 33 N.Y.2d 151, 350 N.Y. S.2d 644, 305 N.E.2d 769 (1973); Patten v. Logemann Bros. Co., 263 Md. 364, 283 A.2d 567 (1971); Bexiga v. Havir Manufacturing Corp., 60 N.J. 402, 290 A.2d 281 (1972); Pike v. Frank G. Hough Co., 2 Cal.3d 465, 85 Cal.Rptr. 629, 467 P.2d 229 (1970); Twerski, Old Wine in a New Flask—Restructuring Assumption of Risk in The Products Liability Era, 60 Iowa L.Rev. 1 (1974).

■ We then move to the question of whether an issue of assumption of risk was raised by the evidence in this case, understanding that under the Texas cases the inquiry is whether Mrs. Henderson voluntarily exposed herself to the risk with knowledge and appreciation of the danger. Ellis v. Moore, 401 S.W.2d 789 (Tex.1966); Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368 (Tex.1963); Dee v. Parish, 160 Tex. 171, 327 S.W.2d 449 (1959); Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953). We hold that defendants have no evidence to point to in this record which could raise

the issue of voluntary encounter with the danger.

From the first sign of malfunction to the crashing finale, Mrs. Henderson was steering and braking as best she knew to avoid the danger and do the least harm. There is no evidence that she knew of means by which she could avoid the danger, if any means did exist. There is no indication in the evidence that she chose to drive her automobile any longer or farther than she could avoid or that she elected to re-encounter the danger. It is no defense to strict liability to show that the driver was *negligent* in not turning off the car ignition (and struggling with manual steering) or in not moving the transmission control to neutral (when she did not know that this was possible while the car was underway). A *negligent* failure to choose the best escape from the throes of peril is not a voluntary encounter with the danger.

### DESIGN DEFECT

The applications for writ of error were originally granted because we agreed with the contentions of the plaintiff on the issues discussed above. Our study of the record now leads us also to agree with the defendants in their contention that no case of liability has been made against them. Both defendants sought judgment non obstante veredicto in the trial court and, through points of error before the Court of Civil Appeals and in applications for writ of error in this Court, have continued to contend that there is no evidence of a design defect. The merit of their position is inescapable.

After failing to find that the gasket on the Henderson vehicle was defectively installed, the jury found "that the design of the air filter housing used on the 1968 Lincoln 462 Series in question was defective." There is no evidence in this record to support that finding.

■ The car manufacturer and its dealer are liable for unreasonably dangerous products—whether designed defectively or improperly and produced as designed, or whether designed perfectly but improperly or defectively produced. Ford Motor Co. v. Russell & Smith Ford Co., 474 S.W.2d 549 (Tex.Civ.App.1972, no writ); Garcia v. Sky Climber, Inc., 470 S.W.2d 261 (Tex.Civ.App.1971, writ ref'd n. r. e.); Pizza Inn v. Tiffany, 454 S.W.2d 420 (Tex.Civ.App.1970, no writ); Franks v. National Dairy Products Corp., 282 F. Supp. 528 (W.D.Tex.1968); Dunham v. Vaughan & Bushnell Mfg. Co., 42 Ill.2d 339, 247 N.E.2d 401 (1969); Keeton: Products Liability—Liability Without Fault and the Requirement of a Defect, 41 Texas L.Rev. 856 (1963); Keeton: Product Liability and the Meaning of Defect, 5 St. Mary's L.J. 30 (1973); Traynor: The Ways and Meanings of Defective Products and Strict Liability, 32 Tenn.L.Rev. 363 (1965); Keeton: Manufacturer's Liability: The Meaning of "Defect" and the Manufacture and Design of Products, 20 Syracuse L.Rev. 559 (1969); Dickerson: Products Liability: How Good Does a Product Have to Be?, 42 Ind.L.J. 301 (1967).

There is surely evidence in this record that on April 15, 1969, when Mrs. Henderson started her trip, *her automobile* was dangerous—and evidence that the gasket beneath the air filter housing was then dangerous. The question is whether this filter housing, and *all housings of the same design*, were unreasonably dangerous from the time of installation. Did some feature of the form or material or operation of the housing threaten harm to persons using the automobile to the extent that any automobile so designed would not be placed in the channels of commerce by a prudent manufacturer aware of the risks involved in its use or to the extent that the automobile would not meet the reasonable expectations of the ordinary consumer as to its safety?

Dr. William Tonn, an engineer and expert witness for the plaintiff, testified unequivocally that he had no criticism of the design of the carburetor and gasket and air

filter housing. Dr. Douglas Muster, Professor of Engineering at the University of Houston, also a witness for the plaintiff, testified at some length to his reasons for believing that the gasket had not been properly installed during production of the car. As for the design itself, he would only say that it was his opinion that positioning of the gasket on top of the carburetor "would be better" than this installation on the bottom of the filter housing. He objected to the straight side edge of the housing adjacent to the rubber gasket, which he thought would have a tendency to be cut if dislocated, but he would not term the latter design as unsafe or dangerous. He also stated that he saw no reason why the rubber gasket would not be expected to remain in place throughout the life of the car if the gasket were properly installed.

All testimony in the record relative to glue on the gasket, and the process by which it was applied, was elicited on the issue of whether the gasket was installed properly during manufacture. The glue was applied into the groove and the gasket was then fixed there. The piece of gasket which the witness LaRue said that he retrieved from this carburetor showed glue along its entire length. There is no evidence of Ford's failure, by design or in production of the Henderson car, to apply sufficient glue to hold the gasket in place after being properly fixed in the groove.

■ After studying this record carefully and viewing the evidence in favor of the jury finding and trial court judgment, we conclude that there is no evidence of danger or lack of reasonable safety in the design itself. One witness says that the design could be better and that an edge or ridge has a tendency to cut a softer object bound across it. Liability is not predicated upon such bare criticism. The same statements could be made about reasonably safe products, for few machines within our ability to purchase could not be designed "better" in some respect. This determination will not suffice as a predicate for a finding of improper or defective design

and a basis for liability of the manufacturer. Garst v. General Motors Corp., 207 Kan. 2, 484 P.2d 47 (1971).

Ford engineers testified that the 462 model air filter housing design was changed at the time of an overall engine change in 1968. They described the 462 design as superior and more expensive to produce than the successor scheme which used a loose gasket rather than one fixed on the underside of the air filter housing. Over 300,000 Lincolns have been produced with the older design and it has been used on over 1,500,000 vehicles. These witnesses testified that they had no notice of any prior claim that the earlier design caused a malfunction or any problem caused by torn pieces of the gasket.

■ The purchaser of an automobile is entitled to expect that its manufacturer has designed the vehicle to meet the demands of its usage without deficiencies that will make it unreasonably dangerous during the course of that usage, but the manufacturer is not charged by the law nor expected by the purchasing public to design every part to be the best that science can produce or to guarantee that no harm will befall the user. This particular Lincoln Continental had been driven across the United States: no attempt was made to prove all the instances when this filter housing had been removed or all of the hands that had touched the gasket.

The jury found that the design defect of the air filter housing was the producing cause of Mrs. Henderson's accident. Perhaps the jury concluded that a piece of rubber did lodge in the carburetor, causing the malfunction, and that this errant piece of rubber resulted from the manner in which the air filter housing was designed. But why would a gasket glued into a groove on the underside of the filter housing be more likely to get into the carburetor than a separate gasket that is placed on the carburetor housing for the filter housing to sit upon? The evidence gives no answer—only silence. The probabilities of

entanglement may favor the loose gasket. When a former Snelling mechanic was asked—if the gasket were properly installed—whether the filter housing could be removed "hundreds and thousands of times without ever doing any harm to the gasket," he answered: "I would think so." And plaintiff's attorney then agreed: "I would, too." But aside from pure speculation, there was no expert testimony or other evidence to support the finding of the jury that the 1962 model Lincoln Continental air filter housing was so designed as to be unreasonably dangerous.

The judgments are reversed; judgment is here rendered that plaintiffs take nothing from defendants.

SAM D. JOHNSON, Justice (dissenting).

This dissent is respectfully submitted.

This writer concurs with the majority's holdings on assumption of the risk or the defenses available to strict liability. The holding to which this writer is diametrically opposed is the majority's determination that there is no evidence of design defect.

Irene S. Henderson brought this suit for personal injuries sustained when she intentionally drove into a utility pole in order to stop the runaway vehicle she was driving. At the time of the accident her 1968 Lincoln Continental automobile was virtually new, having been driven less than 10,000 miles and being less than seven months old. Mrs. Henderson was driving in heavy Houston city traffic and had accelerated to enter and attain speed on a freeway. As she merged into the freeway traffic, and wholly without warning, she found that the speed of her car was not responsive to her control. Though she removed her foot

from the accelerator, the speed of the car did not diminish. She applied her brakes but it resulted in no reduction of her speed. Being unable to reduce the speed of her vehicle, she exited the freeway at the first opportunity to a less busy thoroughfare. At this point her automobile could be best described as a runaway vehicle. She applied the brakes, pumped the brakes, and then pushed with both feet against the brake pedal in an effort to reduce the speed or to stop the car. All of her efforts were without avail and her car, which continued to accelerate even as she applied the brakes, reached a speed of approximately fifty miles per hour. Perceiving that she was approaching a busy intersection she thereupon intentionally steered her car directly into a utility pole to avoid injuring others and to stop her car. She sustained serious injuries.

This action was brought as a products liability case and the plaintiffs proceeded to trial solely upon the theory of strict liability as announced and embraced by this court in Shamrock Fuel & Oil Sales Co. v. Tunks, 416 S.W.2d 779, 783 (Tex.1967) and McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.1967). One of Mrs. Henderson's allegations was that the accelerator of her automobile stuck as a result of a design defect in the air filter housing assembly that is attached to and sits on top of the carburetor. This design defect, she asserted, was the producing cause of her damages.

The trial was to a jury. The jury was asked if they found that the design of the air filter housing was defective. A defective product was defined as one which was unreasonably dangerous.[1] The jury answered affirmatively. The jury was asked if such defective design was a producing cause of the accident. Again the jury an-

1. The definition of a defective product given by the trial court in its charge was as follows:

"A product may be considered defective or defectively designed if, at the time it leaves the seller's hands, it is in a condition not expected by the buyer and which would be unreasonably dangerous to the ordinary buyer. To be 'unreasonably dangerous' the product must be dangerous to an extent beyond that which would be expected by the ordinary buyer with the ordinary knowledge common to the community as to the characteristics of such product."

swered affirmatively. It was on these issues and this theory alone that the trial court entered its judgment for the plaintiffs.

The court of civil appeals encountered no difficulty with this phase of the trial court's judgment; it has not in any way disturbed or even alluded to the jury's finding on design defect. As to this and all other subjects before it (other than assumption of the risk and the defenses available to strict liability) the court stated: "We have considered the other points of error and, finding no merit in them, they are overruled."

In this court the writ was granted, *not* for the purpose of questioning whether there was any evidence to support the jury's finding on design defect, but rather to clarify the court's position on the defenses to strict liability. The majority introduces its consideration of the jury's determination of design defect by asserting: "There is no evidence in this record to support that finding." This declaration is made in the face of the contrary determination by the jury, the contrary judgment of the trial court, and the contrary and unanimous determination by the court of civil appeals. This dissent challenges that declaration.

The majority opinion ignores the fundamental basis on which no evidence points are to be considered. That is, this court *must* view the evidence in its most favorable light in support of the jury finding of design defect, considering *only* the evidence and inferences which support that finding and rejecting the evidence and inferences which are contrary to that finding. Martinez v. Delta Brands, Inc., 515 S.W.2d 263 (Tex.1974); Langlotz v. Citizens Fidelity Insurance Company, 505 S.W.

2d 249 (Tex.1974); Butler v. Hanson, 455 S.W.2d 942 (Tex.1970); Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609 (1950); Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696 (1914). The testimony in the record before this court, both that which will be quoted verbatim in this opinion and that which will be referred to but not quoted, removes any question but that the majority has wholly violated this fundamental rule. It has *not* considered *only* the evidence and inferences which support the finding of design defect. It has *not* rejected the evidence and inferences to the contrary. It has *not* considered the evidence supporting the finding in its most favorable light.

At the outset we are concerned with whether or not the "scintilla" rule is applicable. *See* Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361 (1960). We will first assume its applicability. The rule, simply stated, is that when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is, in legal effect, no evidence, and will not support a verdict or judgment. Seideneck v. Cal Bayreuther Associates, 451 S.W.2d 752 (Tex.1970); Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059 (1898); Curtis v. Curtis, 373 S.W.2d 367 (Tex.Civ.App.—Eastland 1963, writ ref'd n. r. e.). The test for the application of the scintilla rule is that if reasonable minds cannot differ from the conclusion that the evidence offered to support the existence of a vital fact lacks probative force, it will be held to be the legal equivalent of no evidence. Conversely, if the evidence furnishes some reasonable basis for differing conclusions as to the existence of the vital fact by reasonable minds, the jury finding as to the existence of the disputed fact must be upheld.[2] Martinez v. Delta

---

2. In applying the scintilla rule to the instant situation the majority has reached the "strange results" predicted as "theoretically possible" by Chief Justice Calvert. Consider the prophetic example, the situation in this very case, which Chief Justice Calvert posed as an unlikely hypothetical situation:

"It is theoretically possible, and sometimes not far from actual fact, that five members of the Supreme Court will conclude that the evidence supporting a finding of a vital fact has no probative force, and in reaching the conclusion through application of the rule will thus hold, in effect, that the trial judge

Brands, Inc., *supra*; Langlotz v. Citizens Fidelity Insurance Company, *supra*; Renfro Drug Co. v. Lewis, *supra*; Woods v. Townsend, 144 Tex. 594, 192 S.W.2d 884 (1946); Cartwright v. Canode, *supra;* Halliburton Oil Well Cementing Co. v. Groves, 308 S.W.2d 919 (Tex.Civ.App.—Waco 1957, writ ref'd n. r. e.). See Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, *supra*.

Mrs. Henderson's case, lasting nine days in trial to a jury and consuming 1,219 pages in its statement of facts, was grounded on a showing that a piece of the gasket was eventually cut or separated from the air filter housing and fell into the carburetor, holding a "butterfly valve" in the barrel of the carburetor in an open position causing the engine to run at excessive and uncontrolled speed. A mechanic, Levertt LaRue, examined the wreckage of Mrs. Henderson's car and testified:

"Q Did you look specifically into the rear barrel?

"A Yes, I did.

"Q Did you find anything abnormal in the left chamber of the rear barrel?

"A Yes. There was a piece of, at that time I didn't know what it was, it looked like a piece of rubber hung in the left rear barrel and was holding the rear barrel partially open."

It was this piece of the rubber gasket which caused the speed of Mrs. Henderson's car to be uncontrollable. Plaintiffs contended, and the jury believed, that the design of the flanges of the groove on the air filter housing and the gasket inserted in the groove was such that the soft rubber gasket had a propensity to become pinched between the flanges on the air filter housing and the sharp edges of the carburetor so that it could be cut and fall into the butterfly valve of the carburetor. This condition was aggravated by the fact that at least some degree of skill was necessary to place, and when removed replace, an air filter housing of this design on a carburetor so that the gasket fits and stays attached correctly and does not become pinched between the sharp edges of the flanges on the air filter housing and the carburetor. Plaintiffs offered persuasive evidence to support their theory, none of which is even remotely alluded to by the majority.

Gilford E. Gorker, an employee of Ford Motor Company, testified on direct examination by the plaintiffs as to the propensity of the flanges on the air filter housing and carburetor to cut the gasket:

"Q It is kind of rough. I will try not to sit it [speaking of the air filter housing involved] on the furniture and get myself in contempt. But at any rate, looking at the groove from which this gasket has been partially removed one can get a view, can he not, of the sharpness of the edges that go to comprise that groove?

"A Yes. This is the edge of sheetmetal surface. It is relatively sharp.

"Q This gasket that sits inside is made of rubber and synthetic substances relating to it?

"A Yes.

"Q And is subject to being cut or severed by sharp edges?

"A. It is possible to cut it with the sharp edge, yes."

Dr. Muster, plaintiffs' expert witness, on cross-examination by defendants also testi-

---

who overruled a motion for instructed verdict, the twelve jurors who found the existence of the vital fact, the three justices of the Court of Civil Appeals who overruled a 'no evidence' points of error and four dis-

senting justices of the Supreme Court are not men of 'reasonable minds.'" Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, *supra* at 364.

fied as to the propensity of the sharp flanges on the air filter housing to cut the gasket:

"Q What I was working up to was when it was you arrived at your conclusion concerning the design of this part. In that connection are you telling and stating to the jury this is a defective design?

"A I think it could have been better. I say it could have been done better. To use the sharp edged part with rubber is not a good thing, you have a tendency to cut the rubber.

"Q I am not sure you answered the question. The question is not whether it could have been done better. It is your position this is a defective design?

"A Yes, it could have been improved.

"Q That is not defective. Anything can be improved.

"A I am not a lawyer. Anything that can be improved I am interpreting to be defective in that sense, yes."

The above testimony, standing alone, would constitute more than a mere surmise or suspicion of the existence of a design defect. The clear import of Dr. Muster's testimony was that using sharp edges on the air filter housing in conjunction with a rubber gasket was dangerous because there is an inherent tendency for the sharp edge to cut the rubber. A design which uses sharp metal edges with rubber in a location where pieces of rubber could be cut and fall into an automobile carburetor, threatening human life, is unreasonably dangerous and thus defective. Dean Keeton's definition of what constitutes an unreasonably dangerous product fits the instant case precisely: "It is unreasonably dangerous if a reasonable person would conclude that the magnitude of the scientifically perceivable danger *as it is proved to be at the time of trial* outweighed the benefits of the way the product was so designed and marketed." Keeton, Product Liability and Meaning of Defect, 5 St. Mary's L.J. 30, 38 (1973). *See* Ross v. Up-Right, Inc., 402 F.2d 943, 946 (5th Cir. 1968); Helene Curtis Indus., Inc. v. Pruitt, 385 F.2d 841, 850 (5th Cir. 1967). *See also* Wade, Strict Tort Liability of Manufacturers, 19 Sw.L.J. 5 (1965); Keeton, Products Liability—Inadequacy of Information, 48 Tex.L.Rev. 398 (1970).

The above testimony is, however, not the only evidence supporting plaintiffs' theory and the jury's verdict. The air filter housing of course is a unit created to be removed and replaced frequently for routine maintenance operations. There was evidence that an individual placing or replacing an air filter housing of this particular design on a carburetor would have difficulty in ascertaining whether he had done so correctly.

Dr. Muster, cross-examination by defendants:

"Q In addition to the fact we agree it is a simple skill to insert that, even I can do it. The placing of this air filter housing properly on top of the carburetor is a little more difficult for me than putting the gasket in, but it is also essentially a simple mechanical skill?

"A The way it is designed you can't see if you have it on. If I were doing this I would do it more by feel.

"Q You don't think placing this on is a simple mechanical skill?

"A I think it is a simple mechanical skill for feeling you have done it properly. You can't ascertain very well.

"Q With a simple mechanical skill you can tell if you have it on there, you can feel it?

"A You can't tell if you have it on there correctly. You can tell if it is solid."

Perhaps an even more graphic illustration of the difficulty in reattaching an air filter of the type involved onto a carburetor was a demonstration performed by Alexander Kozeb, service manager for Plaza Lincoln-Mercury, while under direct examination by defendants. Kozeb was asked to place a demonstration air filter housing onto a demonstration carburetor. He did so, and when asked if he had it correctly placed on the carburetor he replied unequivocally that he did. A closer examination, however, revealed that he did not in fact have the air filter housing correctly attached to the carburetor.

Still another factor tending to support the jury's finding of design defect is that the process by which the glue, used to hold the gasket onto the underside of the air filter housing, is applied to the groove in the housing is such that the glue is often not applied around the entire circumference of the groove. Moreover, the testimony of Mike Tobrovich, quality control manager for Ford, clearly establishes that Ford was aware of this deficiency. Further, Gilford Gorker, Ford's employee, under questioning by defendant Ford, pointed out that part of the gasket which had been on the Henderson automobile apparently had no glue at all on it. When asked his opinion as to why it did not have glue on it, he replied:

"A I believe that is easily explained. The operator just didn't get glue in that portion of the trough. It is a manual operation and they missed a portion of it."

It is the law of gravity which dictates that when a gasket which is glued to the bottom of an air filter housing is not securely attached it will have a natural propensity to fall down, in this instance, into the barrel of the carburetor. This fact is, however, likewise ignored by the majority.

Still further, several experts testified that the air filter housing and the gasket could have been designed so that the parts of the gasket did not have a propensity to

fall into the barrel of the carburetor. They indicated that using a gasket which would fit on top of the carburetor would be a safer design. For example, Dr. Tonn, plaintiffs' expert witness, testified as follows:

"Q Now, can you see how the top of this carburetor could be designed in such a way that if a piece of the rubber gasket did come off, that it would not fall into the barrel?

"A Well, anything can be designed differently, yes. You could design it so it couldn't fall in. It could be done.

"Q Just what steps could be taken, as we look at the top of this carburetor, to insure that type of a safety precaution?

"A Well, you could use a different type of gasket or different—where the gasket is fitting on the carburetor rather than on the air cleaner. This would be the easiest way that I could think of just offhand of making a change."

The record, furthermore, explicitly shows that Ford, in fact, later changed the design which the jury found to be defective; the new design conformed to that which Dr. Tonn and others testified would be a safer design. It placed the gasket on top of the carburetor rather than gluing it onto the underside of the air filter housing. In addition, the improved design incorporated "rolled" edges on the air filter housing rather than sharp edges and used a gasket of a different and more durable material than the gasket in the instant case, which became brittle after extended use. Dr. Muster was asked to compare the safety of the improved design with that of the abandoned design:

"Q In your opinion would that [the new design] be a safer design than what we have before us in the 462 series [the old design]?

"A  I would say better in the sense it would have no tendency to cut the gasket. You are not after a tremendous sealing quality. It would be better."

No objective consideration of the foregoing testimony which is either directly quoted or summarized, can fairly result in a determination that it constitutes no more than a mere scintilla, surmise or suspicion of the existence of a design defect.

As indisputable as this is, the instant case is even far more compelling than has been demonstrated. What has been said to this juncture has been predicated on the assumed application of the scintilla rule. But "[t]he scintilla rule cannot apply when there is direct evidence of a vital fact; it applies only when the vital fact must be inferred from other relevant facts and circumstances which are proved." Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, *supra* at 363; Martinez v. Delta Brands, Inc., *supra* ("But if negligence may be reasonably inferred from direct evidence, then there is more than a scintilla of evidence."). It is readily recognized that a case based on direct evidence is stronger than one based on circumstantial evidence and, significantly, the cited article's footnote at this precise point asserts "[a] host of cases has been examined and no case has been found in which it was held that direct testimony of the existence of the vital fact did no more than raise a surmise or suspicion of its existence." Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, *supra* at 363, n. 13.

It is not necessary to rewrite the quoted testimony in its entirety to illustrate that direct testimony is not only present but abundant in this record:

Levertt LaRue: "Yes. There was a piece of, at that time I didn't know what it was, it looked like a piece of rubber hung in the left rear barrel and was holding the rear barrel partially open."

Dr. Tonn: "If it held it open, it would prevent it from closing, so the car would not slow down when you removed your foot from the accelerator. . . . Yes. You should not have anything that falls down in the barrels. If it could get lodged in there, it could cause a problem."

Gilford E. Gorker: "Yes. This is the edge of sheetmetal surface. It is relatively sharp. . . . It is possible to cut it [the gasket] with the sharp edge, yes."

Dr. Tonn: "Well, anything can be designed differently, yes. You could design it so it couldn't fall in. It could be done."

Dr. Muster: "I think it could have been done better. I say it could have been done better. To use the sharp edged part with rubber is not a good thing, you have a tendency to cut the rubber. . . . I am not a lawyer. Anything that can be improved I am interpreting to be defective in that sense, yes."

A graphic illustration of the minimal direct evidence needed to uphold a jury finding is Martinez v. Delta Brands, Inc., *supra*. In *Martinez* this court, reversing the court of civil appeals, found sufficient evidence in the record to support the jury's finding of employer Delta Brands' negligence in failing to furnish its employee Martinez with adequate equipment. Martinez contended that the forklift and clamps with which he was furnished to aid in welding two large pieces of metal together were inadequate. The only evidence as to the adequacy of the equipment was the testimony of Martinez that the clamps, which Martinez knew were smaller than necessary for the job, "broke from halfway" when he was welding the pieces of metal together and that the chain on the forklift jumped out of place and the tines of the forklift suddenly tilted forward. This court unanimously held in that case that this evidence, without more, constituted

"some evidence, more than a scintilla, to raise the issue of Delta Brands' negligence."

The evidence in the instant case is infinitely stronger than that considered sufficient to support the jury finding in *Martinez, supra*. It is, in the considered judgment of this writer, simply beyond dispute that the testimony which has been quoted, which is only a small fraction of the record, will support differing conclusions by reasonable minds as to the existence of a design defect. The majority, however, does not search the record for evidence to support the jury's finding, but rather attempts to determine independently of that finding whether "this filter housing, and *all housings of the same design,* were unreasonably dangerous from the time of installation." The function of this court, however, is not to determine whether the design in question was defective; the jury has already determined that issue based upon a proper definition of a defective product as one which is unreasonably dangerous. The proper, and indeed the sole, function of this court is to determine whether there is any evidence to support the jury's finding. If there is *any* such evidence, it is a clear usurpation of the jury's function for this court to substitute for the finding of the jury its theory of what constitutes a design defect.

Judgment should be entered for plaintiffs on the jury verdict.

POPE, McGEE and DANIEL, JJ., join in this dissent.

### ON MOTION FOR REHEARING

SAM D. JOHNSON, Justice (dissenting).

The motion for rehearing filed by petitioner Henderson points out additional deficiencies in the reasoning of the majority. It is incumbent upon this writer to point out the most serious of those deficiencies.

First, it is clearly established that in determining the sufficiency of the evidence to support a jury finding, the court should consider the entire body of evidence and must not look to or avert to the negative findings on other issues. City of Beaumont v. Graham, 441 S.W.2d 829 (Tex.1969); C. & R. Transport, Inc. v. Campbell, 406 S.W.2d 191 (Tex.1966). It is apparent, despite this rule, that the majority, in its consideration of the evidence, attempts to entwine that evidence relating to "installation defect" with evidence pertaining to "design defect." It is in this fashion that the majority both alludes to the evidence on "installation defect" and refers to the jury's negative answers on "installation defect" in an attempt to avoid the affirmative evidence on "design defect," and to also bolster its defeat of the jury's finding on "design defect." The majority points out that the jury did not find for the plaintiffs on the installation defect issues, and inferentially indicates that because of this, such evidence could not be considered in support of the issues of design defect. In doing so, the majority wholly fails to consider evidence which is directly relevant to the issue of design defect; evidence which is replete in the record and a part of which is reflected in this writer's dissent.

Perhaps even more unfortunate than the majority's consideration of the evidence is its substantial retreat from the strict liability standard announced by this court in Shamrock Fuel & Oil Sales Co. v. Tunks, 416 S.W.2d 779 (Tex.1967) and McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.1967). It has accomplished this retreat by the formulation and application of a new and inconsistent test never before appearing in this state. It is a bifurcated test for establishing whether a product is unreasonably dangerous and thus defective—the "prudent manufacturer aware of the risk" *or* "reasonable expectations of the ordinary consumer" test. In determining whether the air filter housing in the instant case is unreasonably

dangerous, the majority asks the following question:

"Did some feature of the form or material or operation of the housing threaten harm to persons using the automobile to the extent that any automobile so designed would not be placed in the channels of commerce by a prudent manufacturer aware of the risks involved in its use *or* to the extent that the automobile would not meet the reasonable expectations of the ordinary consumer as to its safety?" [Emphasis added.]

Thus, according to this new test adopted by the majority, a product will not be considered unreasonably dangerous unless *either* (1) a reasonably prudent manufacturer aware of the risks involved in its use would not place it in the channels of commerce, *or* (2) the product would not meet the reasonable expectations of the ordinary consumer as to its safety. In other words, in the same case, the question of whether a product is defective will apparently be viewed both from the perspective of the manufacturer and from the perspective of the consumer. It is entirely possible that the proof of the consumer will fully establish that the product would not meet the reasonable expectations of the ordinary user, while the proof of the manufacturer will equally establish that a prudent manufacturer might market the product notwithstanding the risks involved in its use. In such a case, will there be recovery since one element of the majority's bifurcated test has been met, or will recovery be defeated since the other element of the majority's bifurcated test has been negated? Is the trial court, on being confronted with jury answers equally establishing the theory of the consumer and the manufacturer, free to give judgment to the party it feels developed the stronger case? If so, the practical effect is that it is incumbent upon the consumer to show *both* that the product would disappoint the reasonable expectations of the ordinary consumer *and* that a prudent manufacturer would not market

the product. The onerous and unwarranted burden thus put upon the consumer to prove a product is defective is obvious.

These problems in the application of the majority's new test are compounded by its application in the instant case. Though the test established by the majority would ostensibly view the question of the defectiveness of a product from *either* the perspective of the manufacturer or the consumer, the majority's application of the test in the instant case stresses *only* the view of the manufacturer. The analysis of the majority is wholly directed toward whether a prudent manufacturer aware of the risks involved in the use of the product would market the air filter housing involved. There is not the slightest discussion directed toward whether an automobile equipped with the type of air filter housing involved would meet the reasonable expectations of the ordinary consumer as to its safety.

Certainly an automobile equipped with an air filter gasket which has a propensity to come loose and fall in the carburetor barrel, threatening human life, "would not meet the reasonable expectations of the ordinary consumer as to its safety." On the contrary, the ordinary consumer would undoubtedly reasonably expect an automobile which had traveled only 9,000 miles to carry the occupant safely to his destination. When that automobile malfunctions due to a cause not in control of the occupant, the reasonable expectations of that occupant as to the automobile's safety are, of course, disappointed.

If the majority, as indicated by the fact that it stresses the perspective of the manufacturer in the application of its test in the instant case, means to suggest that the decisive portion of its test for finding a design defect is whether a prudent manufacturer would market the product, additional problems are created. Not only does this approach violate the majority's own test by ignoring the perspective of the consumer, but it also misperceives the basis

of the strict liability concept that a seller will be liable even though he has "exercised all possible care in the preparation and sale of his product." Restatement (Second) of Torts § 402A. If strict liability is, as indicated by the Restatement, to be predicated upon the condition of the product regardless of the exercise of "all possible care in the preparation and sale" of it by the seller, then questions of whether a "prudent manufacturer" would market a product have no place in the strict liability field. To inquire whether a prudent manufacturer would have marketed the product had he known of the risks involved injects an inappropriate element of negligence into the strict liability question. A "prudent manufacturer" is, after all, simply a manufacturer which exercises ordinary care. Strict liability, however, is imposed despite the use of all possible care in the preparation and the distribution of the product by the manufacturer. The objective consideration of whether a prudent, or ordinarily careful, manufacturer would market a product bespeaks of negligence, and not strict liability.

If the majority, in purporting to consider the question of design defect from both the viewpoint of the manufacturer and the expectations of the consumer, is attempting to articulate a risk versus utility balancing approach to design defect questions,[1] it has failed in its application of such an approach to the facts of the instant case. Any risk versus utility approach for determining the acceptability of a product should consider, among others, the following factors:

"(1) the usefulness and desirability of the product, (2) the availability of other, safer products to meet the same need, (3) the likelihood and probable seriousness of injury, (4) the obviousness of

the danger, (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and (7) the ability to eliminate the danger without seriously impairing the product's usefulness or making it unduly expensive." W. Donaher, et al., The Technological Expert in Products Liability Litigation, 52 Texas L.Rev. 1303, at 1307–08 (1974).

An analysis of the majority opinion reveals no indication that an objective balancing of the foregoing considerations is attempted.

This writer remains firmly convinced that the evidence in the instant case adequately establishes a design defect within the theory of strict liability adopted by this court in Shamrock Fuel & Oil Sales Co. v. Tunks, *supra*, and McKisson v. Sales Affiliates, Inc., *supra*. This is true regardless of the standard applied in establishing whether a product is defective. Thus, petitioners' motion for rehearing should be granted and judgment should be entered on the jury verdict for petitioners. At the very least, in view of the majority's adoption of a new and heretofore unexpressed standard for design defect cases, the case should be remanded to the trial court for retrial in the interest of justice. Tex. Rev.Civ.P. rule 505. *See* Sobel v. Jenkins, 477 S.W.2d 863 (Tex.1972); United States Fire Insurance Company v. Carter, 473 S.W.2d 2 (Tex.1971), Texas Sling Company v. Emanuel, 431 S.W.2d 538 (Tex.1968); Scott v. Liebman, 404 S.W.2d 288 (Tex.1966). Even a cursory glance at this record reveals that the case has not been fully developed under the *present* theory of design defect adopted by the court in the instant case. In view

---

1. This writer would, personally, favor such an approach. *See* Ross v. Up-Right, Inc., 402 F. 2d 943, 946 (5th Cir. 1968); Helene Curtis Indus., Inc. v. Pruitt, 385 F.2d 841, 850 (5th Cir. 1967); Metal Window Products Co. v. Magnusen, 485 S.W.2d 355 (Tex.Civ.App.—Houston [14th Dist.] 1972, no writ);

Keeton, Product Liability and Meaning of Defect, 5 St. Mary's L.J. 30, 38 (1973); Keeton, Products Liability—Inadequacy of Information, 48 Texas L.Rev. 398 (1970); and Wade, Strict Tort Liability of Manufacturers, 19 Sw.L.J. 5 (1965).

of the fact that the majority, on the ultimate appeal of this case, has formulated a new standard for determining the defectiveness of a product, justice requires that the case be retried in light of the new standard.

POPE, McGEE and DANIEL, JJ., join in this dissent.