**FORD MOTOR COMPANY et al.,**
**Appellants,**

**v.**

**V. A. BLAND, Jr., Appellee.**

**No. 5363.**

Court of Civil Appeals of Texas,
Waco.

Dec. 19, 1974.

Rehearings Denied Jan. 16, 1975.

John G. Street, Jr., Fort Worth, Haley, Fulbright, Winniford & Bice, Waco, for appellants.

Sheehy, Lovelace & Mayfield, Waco, for appellee.

HALL, Justice.

This is a products liability suit. It stems from a single-car accident in which the plaintiff sustained personal injuries when a Mercury Capri automobile he owned and was driving overturned. Plaintiff alleged, inter alia, that the accident and his injuries were caused by a defective left-front shock tower on the Capri automobile; and that this defect existed when the car left the possession of Ford Motor Company, the defendant-manufacturer, and when it was sold to him by Marstaller Motors, Inc., the defendant-retailer. Following a jury trial, judgment was rendered on the verdict that plaintiff recover damages totaling $358,180 from the defendants, jointly and severally, and that Marstaller Motors have full indemnity from Ford Motor Company. We affirm.

The accident occurred shortly after midnight on June 2, 1972, on a straight portion of Interstate Highway 35, eleven miles south of the City of Waco. The highway at that point provides two lanes for northbound traffic with adjoining paved shoulders, two lanes for southbound traffic with adjoining paved shoulders, and a grass-covered median between the northbound and southbound lanes. Plaintiff was driving north in the inside lane when the Capri went into a skid. It skidded off the highway onto the shoulder, nearly to the median-edge of the shoulder, then partially back onto the inside northbound lane; and then it began to roll. Plaintiff was thrown from the vehicle and suffered severe bodily injuries.

The sole vertical support for each front wheel of the Capri automobile is supplied by a mechanical device referred to by the parties as a "shock tower assembly." This shock tower is nothing more than the joinder of a coil spring and a shock absorber. The lower end of the shock tower, which is also the bottom part of the shock absorber, is a metal tube. The outside diameter of the tube is two inches, it is fifteen inches long, and its wall is .08 inches thick. The tube serves as a base for the coil spring which rests on a flange welded to the tube near its top. From the underside of the front fender of the car, the upper end of the coil spring and the piston rod of the shock absorber, which extends upward out of the tube and through the spring, fit into a fixture located on the fender. The lower end of the tube extends about two and one-half inches through an aperture provided for it in the front wheel spindle and is there welded to the spindle. Side-to-side and front-to-rear supports are accorded the front wheels of the Capri only through the use of a track control arm and a steering tie rod on each wheel.

In the course of the accident in question, the tubes of both shock tower assemblies on plaintiff's car were broken off at the place where each joined a front wheel spindle. The fractures were not breaks in the weldings; but, rather, were breaks completely across the diameter of the tubes at the upper edge of the arms of the apertures which held the tubes to the wheel spindles, leaving the bottom two and one-half inches of the tubes attached to the spindles. And, while the right-front wheel remained attached to the car after the accident, the left-front wheel was found about 30 feet away.

One theory upon which plaintiff prosecuted this case is that the left-front shock tower broke while he was in the skid, that the car was thereby caused to roll, and that the shock tower was structurally defective

when placed on the car by Ford Motor Company. This was defended on assertions that the left-front shock tower was not defective when the car left the factory, and that both shock towers were broken after the car began to roll. The jury made findings in favor of plaintiff's theory which support the judgment.

■■ Defendants contend that the evidence is legally and factually insufficient to establish (a) that the left shock tower broke *before* the car began to roll, and (b) that it was defective when it left Ford Motor Company's possession.

Plaintiff does not remember the circumstances surrounding the accident. He employed Dr. William H. Tonn, Jr., a consulting engineer who specializes in reconstructing accidents and determining their causes, to evaluate this one. Dr. Tonn began his investigation 25 days after the accident. It included, among other things, a view of the site, using photographs taken immediately after the accident which show skid marks and gouges on the roadway; the making of measurements; a determination of the friction coefficient of the road surface; the taking of photographs; and a detailed inspection of the automobile, especially of the damaged and broken parts. Based upon the results of this investigation, which we need not detail, Dr. Tonn concluded that just prior to the rolling of plaintiff's car, it went into a broadside skid, skidded out of the lane of travel onto the median-shoulder, then partially back onto plaintiff's lane of travel; that during the early stages of the skid plaintiff's vehicle was rotating clockwise out of control, and at one stage the front of the car was pointed "at about 3:00 o'clock," but as it began its return to the traveled lane plaintiff was regaining control and the car had begun rotating counter-clockwise; that soon after the car partially returned to the lane of travel, and while plaintiff was still in the skid, the left-front shock tower broke; that the left-front wheel and tire then turned under with the bottom of the wheel and tire turning to the inside; that this resulted in the car literally vaulting into the air and then, after landing, rolling down the highway; and that but for the breaking of the shock tower, plaintiff would have recovered control of the vehicle. These conclusions are supported by highway skid marks and gouge marks made by plaintiff's car; by the condition of the car body; by the damaged condition of the left-front tire and wheel rim, the left-front shock tower, and the arm of the left tie rod, after the accident.

Dr. Tonn testified that his examination of the break in the left-front shock tower revealed that a part of the break was old, and the other part was fresh; and that the tube was fractured before it broke in this accident. He testified: "I looked at it with ten-power magnification and I could see that the grain structure of the metal had been deformed as though someone had taken a little hammer and tapped on it. Now, nothing tapped on it but what happened was that the break occurred . . . and then as the car went down the road there was a little bit of give, not as much as I'm showing here, but there's some force put on there and this little crack here would open and close and there was some give in it and this would allow the metal to rub like this against each other, the two faces, and this would cause the face to show the exhibited characteristics I saw on it. This other portion of it was a typical fracture, breaking down, and the grain structure, it was clean, then, hadn't corroded, and it was bright and showed it had broken at some other time so this break occurred in a two phase or two component or two different times."

There is testimony from plaintiff, Dr. Tonn, Charlie Marstaller, Jr., of Marstaller Motors, Inc., and Robert E. Martin, who was defendants' expert witness, that Mr. Marstaller received the car directly from Ford Motor Company; that he sold it new to plaintiff in the identical condition in which he received it; that plaintiff had owned the car six weeks and had driven it

3,664 miles at the time of the accident without damage to the shock-tower assemblies; that the shock-towers had not been tampered with, abused, or damaged before the accident; that driving the car 3,664 miles in six weeks would not render the left-front shock tower defective; and that the left-front shock tower on plaintiff's car would not have fractured under the stress of the skid in question if it had not been structurally defective.

Dr. Tonn's testimony shows that the left shock tower broke before the car began to roll. And the other testimony we have recited is circumstantial proof that the defect existed when Ford Motor Company relinquished possession of the car. Direct proof of this fact is not required. Darryl v. Ford Motor Company (Tex.Sup., 1969) 440 S.W.2d 630, 632. Moreover, a review of all of the evidence convinces us that the evidence is factually sufficient to establish these two facts.

Defendants argue that Dr. Tonn was not qualified to express an opinion as to whether a crack existed in the tube of the left-front shock tower prior to the accident, and that this testimony by him was therefore erroneously admitted by the trial court. Similarly, defendants assert error in the trial court's refusal to permit Charlie Marstaller, Jr., to express his opinion as an expert witness that the left-front wheel of plaintiff's car was broken loose in the roll, and not before.

■ The question of whether a witness is qualified by experience, training and observation to express an opinion as an expert on a particular subject is addressed to the sound discretion of the trial court; and the court's ruling in this regard will not be disturbed on appeal without a clear showing of abuse. City of Teague v. Stiles (Tex.Civ.App.—Waco, 1953, writ ref., n. r. e.) 263 S.W.2d 623, 628; Louis v. Parchman (Tex.Civ.App.—Ft. Worth, 1973, writ ref., n. r. e.) 493 S.W.2d 310, 321.

■ Dr. Tonn received his doctorate in engineering in 1942. He is a member of National and State Societies of Professional Engineers, The Society of Automotive Engineers, The American Institute of Chemical Engineers, The American Society of Mechanical Engineers, The American Society For Testing Materials, The American Society of Metals, and a number of other academic and industrial associations related to his specialty. These organizations aid him to stay abreast of day-to-day and year-to-year developments in his field. Since 1949, he has handled about 3,500 problems dealing with analysis and reconstruction of accidents. In the light of Dr. Tonn's expertise and his investigation in this case, the court did not abuse its discretion in permitting him to give the questioned testimony.

■ Mr. Marstaller testified that he began as a mechanic in 1933 and for 15 or 20 years thereafter reconstructed "total loss" cars, doing both body work and mechanical work; that since 1953 he has been an automobile dealer selling Lincoln and Mercury automobiles, but still, from time to time, works on cars; that he is thoroughly familiar with automobile bodies and motors, and the body and the mechanical workings of the car in question; that his background has not provided him any formal training or experience in accident reconstruction; and that he has been "strictly involved in trying to repair and fix cars that have been in accidents." His investigation of this accident consisted only of what the court could properly have considered as a rather cursory view of plaintiff's car one week before trial, almost two years after the occurrence. There is no abuse of discretion in the court's holding that this witness was not qualified to express the opinion in question.

■ Defendants assert that the jury's award of $100,000 to plaintiff for future physical pain and mental anguish is without support in the evidence, or, alternatively, so against the great weight and prepon-

derance of the evidence as to be manifestly unjust. These contentions are overruled.

Plaintiff is a widower, with a daughter, age 11, and a son, age 8. His life expectancy at the time of his injury was 41.25 years. One of his main goals before he was hurt was to educate his children and give them a better start in life than he had.

Plaintiff's formal education ended with high school. However, he was extraordinarily ambitious and industrious, and quick to learn. With long hours of extra work at night and on week-ends, he improved his base pay from less than $500 per month in 1968 to $1,006 monthly in 1972. At the time of the accident, at age 30, he was the Freight Agent for the M–K–T Railway at its Temple, Texas office. As such he supervised the work of men who were 25 years older than he. All liked him and respected him. His regular work week was Monday through Saturday, but he usually worked Sundays, too. He was proud of his job, and was regularly working many extra hours to improve himself and his performance. One of his main chores was to figure complex freight rates, which he did exceedingly well. His work was outstanding, and business increased $750,000 in plaintiff's first year as freight agent. He was recommended for promotion at the time of his injury.

The medical proof shows that plaintiff received physical injuries on virtually every part of his body; that among them was "a closed head injury with cerebral contusions" with total disruption of some of the nerve cells which cannot heal; that he was hospitalized four weeks; that he has marked weakness of his left side and walks stiff-legged on the left because of the brain injury and the resulting impairment of the nerve cells which supply his left leg; that he has marked impairment of his judgment and insight; that he received a "terrible head injury," "organic brain damage"; that his "intellectual function-ing" is severely impaired; that his ability to store information in his memory and "to retain recently acquired material," is severely impaired; and that he is unable to do the simplest math problems. Plaintiff's treating neurosurgeon testified that plaintiff "has enough judgment and insight to realize that he is not functioning at his previous level, that he can't get his brain going, that his thinking is off, that his memory is impaired, and that his ability to earn his livelihood and provide for his family is seriously impaired, and he is quite worried about his future. He is depressed about his future. This is a reactive depression. It is the direct result of an injury in a man who has suffered severe intellectual impairment and yet not so much that he can't realize it. I do not feel that he will improve any more than he has, now. I don't think he'll ever be any better than he is right now. I do not think he is employable or will be employable for the rest of his life. Mental anguish because of this . . . will continue for the rest of his life. There just isn't anything in the foreseeable future that will take the worry off plaintiff's shoulders." He testified that there is no operative or treatment procedure that will repair plaintiff's brain damage; that it is extremely frustrating for plaintiff to still have a mind with a "pretty good I.Q. and be able to realize that he can't use it"; and that this frustration will continue for the remainder of plaintiff's life.

■ A number of defendants' points of error are concerned with matters of contributory negligence, and with a proposed reduction of plaintiff's damages because of an asserted misuse of seat belts by him. Defendants' contentions in these regards have been rendered untenable by recent holdings of our Supreme Court in Henderson v. Ford Motor Company (Tex.Sup., 1974) 519 S.W.2d 87; and in Carnation Company v. King Son Wong (Tex.Sup., 1974) 516 S.W.2d 116. In *Henderson* the

Court held that contributory negligence is not a defense in a product liability case. In *King Son Wong*, in a written opinion refusing an application for writ of error, no reversible error, the Court stated that "persons whose negligence did not contribute to an automobile accident should not have the damages awarded to them reduced or mitigated because of their failure to wear available seat belts."

Defendants' remaining points and contentions have been duly considered and found to be without merit. They are overruled.

The judgment is affirmed.